**Wallace H. WEISS, Plaintiff,**

v.

**UNITED STATES of America, et al., Defendants.**

**Civ. A. No. 84–0129–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Oct. 18, 1984.

Teena D. Grodner, Alexandria, Va., for plaintiff.

Paula P. Potoczak, Asst. U.S. Atty., Alexandria, Va., for defendants.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, District Judge.

I. *Findings of Fact*

1. The plaintiff, Wallace H. Weiss, is Jewish. Testimony of plaintiff.

2. The plaintiff is a resident of Alexandria, Virginia. Testimony of plaintiff.

3. Weiss was employed by the Defense Logistics Agency as a GS–13 Operations Research Analyst from February 17, 1980 until August 4, 1983. Testimony of plaintiff.

4. Weiss was fully qualified for his position when he was hired.

5. Plaintiff's supervisor, Dennis L. Zimmerman, is not Jewish and did not know

that the plaintiff was Jewish when he hired him; Mr. Zimmerman became aware of Weiss's religion only after Weiss told him. Weiss was the only Jewish employee in the office. Testimony of Dennis Zimmerman.

6. Neither of Weiss's second-line supervisors, Mr. Clark and Colonel Sims, is Jewish. Testimony of Mr. Clark and Colonel Sims.

7. From 1980 until March 1982, plaintiff Weiss was the constant target of a variety of highly offensive religious slurs and taunts made by a co-worker, Michael Pouy, and by plaintiff's supervisor, Dennis Zimmerman. These slurs included such taunts as "resident Jew," "Jew faggot," "rich Jew," "Christ killer," "nail him to the cross," and "you killed Christ, Wally, so you'll have to hang from the cross." Testimony of plaintiff, Sandra Jones, and Joan Harris.

8. Mr. Zimmerman made no attempt to stop the repeated anti-Semitic remarks that were directed at the plaintiff by Mr. Pouy. Indeed, Mr. Zimmerman himself repeatedly directed anti-Semitic remarks at Weiss. Testimony of plaintiff, Sandra Jones, and Joan Harris.

9. Prior to March 26, 1982, Weiss never repeated or complained about the anti-Semitic remarks to anyone above Mr. Zimmerman. However, the remarks upset Weiss greatly, and caused him to develop stress and anxiety-related disorders. Testimony of plaintiff.

10. Prior to March 26, 1982, and despite being subjected to his co-worker's and supervisor's slurs regarding his religion, Weiss received high performance evaluations and generally performed his duties to his supervisors' satisfaction; in February 1982 his supervisor approved Weiss's within-grade salary increase. Prior to this time no performance warnings or actions had been taken against plaintiff. Plaintiff's Exhibits 14, 17 and 19.

11. On March 26, 1982, supervisor Zimmerman held a branch meeting to discuss office reorganization. During that meeting, in front of the branch staff, Pouy called Weiss "the laziest motherfucker in the office." Testimony of plaintiff, Dennis Zimmerman, and Michael Pouy.

12. In response to Pouy's outburst at the meeting, Zimmerman took the following steps:

(a) Zimmerman immediately asked Pouy to apologize to the plaintiff, and Mr. Pouy did apologize for his language. Testimony of plaintiff and Michael Pouy.

(b) At the branch meeting, Zimmerman acknowledged that he did not share Pouy's opinion of the plaintiff. Testimony of Dennis Zimmerman.

(c) Mr. Zimmerman met privately with Mr. Pouy, verbally admonished him for his behavior, recommended that he take a course in stress management, and asked him to apologize to Weiss. Testimony of Dennis Zimmerman and Michael Pouy.

(d) Mr. Zimmerman held a meeting with Mr. Weiss advising him of his actions with regard to Pouy's outburst. Testimony of plaintiff and Dennis Zimmerman.

13. Pouy wrote Weiss a written note of apology. Testimony of plaintiff and Michael Pouy.

14. Weiss was already upset and humiliated by Pouy's and Zimmerman's earlier religious slurs, and the March 26 confrontation, while clearly not religious in nature, was the traumatizing event which triggered an obsessive, and perhaps vindictive reaction toward Pouy and Zimmerman.

15. Weiss felt that a work environment which permitted religious slurs was responsible for the crude epithet expressed by Pouy on March 26, 1982.

16. Weiss's obsessive reaction to the slurs of Mr. Pouy and Mr. Zimmerman was exacerbated by his awareness of the persecution suffered by Jews throughout history and especially during World War II. Testimony of Lawrence Sank.

17. On March 26, 1982, and during the week thereafter, Weiss spoke to Mr. Zimmerman and demanded an end to the anti-Semitic remarks. The plaintiff also complained to Mr. George Clark, Zimmerman's

supervisor, about the anti-Semitic remarks and Pouy's outburst; moreover, he expressed his strong dissatisfaction with the disciplinary action taken against Mr. Pouy. Despite plaintiff's request, Clark refused to suspend Pouy, refused to fire Zimmerman for his failure to discipline Pouy, and supported Zimmerman's disciplinary action against Mr. Pouy. Testimony of plaintiff.

18. Mr. Clark held a staff meeting in April 1982 admonishing all personnel to use more appropriate language around the office since some individuals could be offended by improper language. Testimony of Mr. Clark.

19. Zimmerman knew that the plaintiff had reported him to Mr. Clark, because Clark spoke to Zimmerman about the matter on March 29, 1982. Plaintiff's Exhibits 8 and 9.

20. Mr. Zimmerman was unhappy with Weiss's vehement criticism of the disciplinary action taken against Mr. Pouy. While Zimmerman stopped directing religious slurs toward the plaintiff after March 26, 1982, Mr. Zimmerman did begin to retaliate against Weiss in the following manner:

(a) by criticizing and demeaning Weiss for his work performance, especially in front of other workers. Testimony of plaintiff and Sandra Jones; Plaintiff's Exhibit 5.

(b) on April 1, 1982, by revoking prior authorization for Weiss to present a paper at a symposium. Plaintiff's Exhibits 15, 16.

(c) beginning March 30, 1982, to keep Memoranda for the Record ("MFR") to build a record against Weiss. Plaintiff's Exhibits 6, 7.

(d) by issuing a performance appraisal on April 30, 1982 for Weiss in which he rated Weiss substantially lower than he had in his prior appraisal of April 30, 1981. Plaintiff's Exhibits 14, 18.

(e) by giving Weiss inappropriate and unreasonably difficult work assignments, by blaming Weiss for delays in projects which were largely beyond plaintiff's control, and by failing to give Weiss the necessary time

and assistance to perform many assignments. Testimony of plaintiff, William Hargrave, Paul Wright, and Margaret Jones.

(f) by glaring at Weiss and generally treating him with a hostile attitude. Testimony of plaintiff.

21. Plaintiff initiated EEO counseling on May 18, 1982, naming Mr. Zimmerman as an Alleged Discriminating Official. Plaintiff's Exhibit 24.

22. On May 25, 1982 Zimmerman was questioned for several hours by plaintiff's EEO counselor; after leaving that session, Zimmerman threatened to sue plaintiff for what he said and what he wrote in his EEO complaint. Plaintiff's Exhibit 24, testimony of plaintiff.

23. On May 27, 1982 Zimmerman requested an investigation of plaintiff for alleged contract improprieties; permission was denied because the allegations were found to be groundless. Plaintiff's Exhibits 25 and 26.

24. No disciplinary action had ever been taken or proposed against Weiss at DLA prior to May 1982. Plaintiff's Exhibit 25.

25. In May 1982 Weiss complained to Mr. Clark that Zimmerman was retaliating for his initiation of EEO proceedings, that Mr. Zimmerman was calling him demeaning names such as "crazy Wally," and that Zimmerman's actions were giving him headaches and stomach pains. Plaintiff's Exhibit 100.

26. Still dissatisfied with the discipline meted out to Pouy, obsessed with anger toward Pouy and Zimmerman for their pre-March 1982, verbal, religious-based abuse, and angry at Zimmerman's retaliatory reaction to his complaints, Weiss filed an EEO complaint based on age and religious discrimination on June 17, 1982, naming Zimmerman as the discriminating official. Plaintiff's Exhibit 21.

27. Weiss filed further EEO complaints on November 5, 1982; December 13, 1982; December 27, 1982; January 26, 1982; May

23, 1983 and June 13, 1983. Plaintiff's Exhibits 21 and 22.

28. Mr. Zimmerman brought or proposed bringing misconduct-based disciplinary actions against Weiss on May 27, 1982; February 4, 1983; February 17, 1983; April 8, 1983 (two actions). A grievance examiner recommended that Zimmerman's reprimand of February 4 be rescinded. Plaintiff's Exhibits 17, 23, and 35.

29. Mr. Zimmerman held performance counselings with or brought proposed performance-based actions against Weiss on July 19, 1982; September 17, 1982; December 17, 1982; January 17, 1983; February 1, 1983; February 14, 1983; March 3, 1983; March 10, 1983; May 5, 1983; May 27, 1983; May 31, 1983 and July 8, 1983. Plaintiff's Exhibits 17 and 23.

30. In January 1983, Weiss met with his third line supervisor, Colonel McFarland. Colonel McFarland encouraged Weiss to put the past behind and to concentrate on his work. Weiss, however, simply reiterated his frustration with Mr. Zimmerman's harassment and his intention to "get" Pouy and Zimmerman for what they had done to him. Testimony of Colonel McFarlane.

31. On July 8, 1983, Zimmerman proposed plaintiff's removal. Plaintiff's Exhibit 110.

32. Relying on information in the proposed removal, which was written by Mr. Zimmerman, Colonel McFarlane decide to remove Weiss effective August 12, 1983. Plaintiff's Exhibits 107, 109, 110, and Defendant's Exhibit 1.

33. Agency officials became aware of Zimmerman's anti-Semitic verbal abuse of plaintiff, and of Zimmerman's retaliation against the plaintiff, when the plaintiff spoke out against these attacks publicly, and when plaintiff initiated EEO proceedings. Plaintiff's Exhibit 21.

34. The agency did not discipline Mr. Zimmerman nor did they order him to cease his retaliatory harassment of the plaintiff.

35. Agency officials refused Weiss's requests for reassignment to another supervisor even though they could have moved Weiss to another branch. Plaintiff's Exhibits 104 and 105.

36. Mr. Zimmerman's harassment of Weiss after March 1982 caused Weiss to develop anxiety and stress related disorders, including bleeding and cracking on the hands, headaches, nausea, and stomach pains; these disorders also adversely affected Weiss's performance and conduct at the office.

37. After March 1982 Weiss became obsessed with getting even with Zimmerman and Pouy, and be began to devote a great deal of his time at the office to his EEO claim, which, together with his anxiety and stress related disorders caused by his supervisor's harassment, contributed to the considerable decline in his work performance. Weiss's job performance continued to deteriorate until his termination in August 1983 by Colonel McFarlane for nonperformance of duties.

*Conclusions of Law*

1. This Court has jurisdiction of this action pursuant to 42 U.S.C. § 2000e *et seq.*, Title VII of the Civil Rights Act of 1964 *as amended* by the Equal Opportunity Act of 1972, 42 U.S.C. § 2000e–16.

2. Admiral Grinstead, Director of the Defense Logistics Agency, is a proper party defendant. 42 U.S.C. § 2000e–16(c).

3. In order to prevail in an action brought pursuant to Title VII of the Civil Rights Act, the plaintiff has the initial burden of establishing a prima facie case of employment discrimination. The plaintiff must show actions taken by the employer which, if unexplained, establish by a preponderance of the evidence that such actions were based upon a discriminatory criterion forbidden by the Act. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

4. In order to make out a prima facie case of retaliatory discharge, plaintiff must show that he opposed an employment

practice made unlawful by Title VII, that he was subsequently subjected to adverse employment action, and that there was a causal connection between the two. *Womack v. Munson,* 619 F.2d 1292 (8th Cir. 1980), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1980).

5. Once the plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the discharge. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

6. If the defendant meets this burden, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

7. These basic allocations of the burdens of proof apply to all Title VII cases. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

8. Title VII has, from its enactment, prohibited discrimination against an individual with respect to his conditions of employment because of such individual's religion or national origin. 42 U.S.C. § 2000e–2(a).

9. Religious harassment, like sexual harassment, can take many forms, but there are two basic varieties: harassment that creates an intimidating, offensive environment ("condition of work"), and *"quid pro quo"* harassment, in which a supervisor demands that an employee alter or renounce some religious belief in exchange for job benefits. *See Katz v. Dole,* 709 F.2d 251 (4th Cir.1983).

10. An occasional offensive religious epithet by a co-worker does not necessarily give rise to a Title VII claim against an employer. Nonetheless, when an employee is repeatedly subjected to demeaning and offensive religious slurs before his fellows by a co-worker and by his supervisor, such activity necessarily has the effect of altering the conditions of his employment within the meaning of Title VII. *Compston v. Borden, Inc.,* 424 F.Supp. 157 (S.D.Ohio, 1976). Continuous abusive language, whether racist, sexist, or religious in form, can often pollute a healthy working environment by making an employee feel uncomfortable or unwanted in his surroundings. In more extreme cases such as this one, it can even severely affect the employee's emotional and psychological stability.

The patterned and discriminatory harassment of plaintiff by his co-worker and by his supervisor prior to March 26, 1982 violated plaintiff's right to non-discriminatory terms and conditions of employment; plaintiff's opposition to this abuse was protected by § 704(a) of Title VII, as was his participation in EEO proceedings.

11. The defendants attempted to justify the plaintiff's discharge on the grounds that it was impelled by his poor work performance. This Court concludes that this reason is merely a pretext, developed by supervisor Zimmerman, for the underlying motivation to fire Mr. Weiss for his charges of discrimination against Mr. Zimmerman.

12. After the plaintiff began to express his opposition to the offensive religious slurs to which he had been subjected, and especially after plaintiff initiated EEO proceedings against his employer for those slurs and the hostile environment that they had created, plaintiff's supervisor deliberately and intentionally engaged in retaliation. While the demanding religious slurs ceased after Weiss went to his supervisor's superiors and complained, this Court concludes that Zimmerman gave plaintiff inappropriate and unreasonably difficult work assignments, rated his work performance substantially lower than he had prior to the plaintiff's complaints, and frequently berated and demeaned Weiss's work in front of others in order to retaliate against him and

establish a pretextual justification for his discharge.

13. The findings indicate that from March 26, 1982 until the time he was terminated, Weiss's frustrations with his difficult work environment had a negative impact upon his work performance and attitude. However, an employer cannot use an employee's diminished work performance as a legitimate basis for removal where the diminution is the direct result of the employer's discriminatory behavior. *Henson v. City of Dundee*, 682 F.2d 897, 910 (5th Cir.1982); *DeGrace v. Rumsfeld*, 614 F.2d 796, 804 (1st Cir.1980).

In this action, Weiss's diminished work performance and attitude was caused by the pattern of anti-Semitic verbal abuse directed at Weiss by Pouy and Zimmerman until March 26, 1982, and by Zimmerman's subsequent retaliatory harassment of plaintiff and obstruction of his work. While the plaintiff could have quit his position in the face of his supervisor's retaliation and relied totally upon EEO proceedings for redress, he instead conscientiously attempted to do his job in spite of the difficult circumstances. Plaintiff's performance was understandably below average during this difficult period; nonetheless, the defendant cannot point to that performance as a legitimate basis for removal when the defendant itself is responsible for creating the difficult working conditions and, in effect, causing the sub-par performance.

14. Where plaintiff makes out a "condition of work" claim under Title VII, plaintiff must demonstrate the propriety of holding the employer liable for the actions of its supervisors under some theory of *respondeat superior*. In general, the plaintiff must establish that the employer had actual or constructive knowledge of the existence of the offensive discriminatory or retaliatory working environment and yet took no prompt and adequate remedial action. The plaintiff can do this by proving that complaints were lodged with the employer, or that the harassment was so pervasive that the employer's awareness can be inferred. *Katz v. Dole*, 709 F.2d 251 (4th Cir.1983).

Prior to March 26, Weiss never publicly opposed co-worker Pouy's and supervisor Zimmerman's verbal anti-Semitic abuse. After the March 26 incident, however, the agency was certainly put on notice about the discriminatory behavior when Weiss met with Zimmerman's supervisors to complain about the harassment, and when Weiss initiated EEO proceedings against Zimmerman. Even though the agency did act swiftly and effectively to put an end to the actual verbal religious abuse after March 26, the agency should also have been aware that its supervisor was retaliating against Weiss for his vocal complaints against Zimmerman's and Pouy's abuse when Weiss personally complained to Zimmerman's supervisors about the retaliation, when Weiss filed EEO complaints about such retaliation, and when Zimmerman's evaluations of Weiss's work performance became considerably more critical after the March 26 incident.

15. Once an employer has been put on notice about religious harassment or retaliation, the employer must do more than merely indicate the existence of an official policy against such harassment. Where the employer's supervisory personnel acquiesced and participated in such harassment, the burden on an employer seeking to avoid Title VII liability is especially heavy. *Katz v. Dole*, 709 F.2d 251 (4th Cir.1983).

Even though the agency knew that Zimmerman had discriminated against Weiss prior to March 26, and even though Weiss repeatedly complained about Zimmerman's retaliatory actions, agency officials took no action against Zimmerman, and in fact they relied almost exclusively on Mr. Zimmerman's representations in deciding to remove the plaintiff. When an employer vests wide discretion over employee assignments and evaluations in the hands of a supervisor, and when the employer is put on notice that the supervisor has engaged in discriminatory or retaliato-

**1058**

ry actions against an employee, the employer can certainly be held liable if it relies upon that supervisor's representations to remove the employee. *Taylor v. Safeway Stores,* 365 F.Supp. 468, 472 (D.Colo.1973), *aff'd in part, rev'd in part on other grounds,* 524 F.2d 263 (10th Cir.1975).

16. This Court concludes, then, that defendant discriminated against plaintiff concerning the conditions of his employment because of his religion and national ancestry, in violation of the command of Title VII.

17. This Court concludes that the plaintiff failed to make out a *prima facie* case of age discrimination under Title VII.

18. A Judgment Order will enter establishing the relief to which plaintiff is entitled, and setting attorneys fees, after the hearing scheduled for November 2, 1984.