**Virginia DELGADO, Plaintiff,**

v.

**John F. LEHMAN, Secretary of the Navy, Defendant.**

### Civ. A. No. 86–0596–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

March 24, 1987.

Jonathan M. Smith, Victor M. Glasberg, Alexandria, Va., Joseph M. Sellers, Washington Lawyers' Committee for Civ. Rights Under Law, Barry Reingold, Washington, D.C., for plaintiff.

David Ranowsky, Office of the Gen. Counsel, Naval Facilities Engineering Command, Dennis Szybala, Asst. U.S. Atty., Alexandria, Va., for defendant.

## MEMORANDUM OPINION

CACHERIS, District Judge.

Plaintiff Virginia Delgado filed a Complaint against the Navy alleging that she had been subjected to a continuing course of sexual harassment that resulted in a denial of her within grade increase in salary and in her discharge from the Naval Facilities Engineering Command in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e–2 (1981), as amended. Defendant John F. Lehman, Secretary of the Navy, denied any sexual harassment and claimed that plaintiff's within grade pay raise was denied and her employment terminated because of her inability to perform critical elements of her Basic Performance Appraisal Program. For the rea-

sons set forth below, judgment is entered in favor of the plaintiff and against the defendant.

## I

### Findings of Fact

After reviewing the pleadings, evidence and authorities, the court makes the following findings of fact:

Plaintiff Virginia Delgado ("Delgado") is a female citizen of the United States. At all times pertinent to this action she was employed by the Naval Facilities Engineering Command ("NAVFAC") in Alexandria, Virginia. Plaintiff commenced her government service in January, 1948, and in 1972 began performing Equal Employment Opportunity ("EEO") duties. In 1973, she began working for the Naval Material Support Activity as Hispanic Program Coordinator. Her duties there included EEO work. She has accumulated 236 hours of college credits, which are the equivalent of three years of college.

On January 20, 1983, Delgado was removed from her position as GS–11 EEO Specialist in the EEO Office of NAVFAC. The stated grounds for her removal were nonperformance of the critical elements of her Basic Performance Appraisal Program. (Testimony of Plaintiff, Defendant's Exhibit 24).

Defendant John F. Lehman is Secretary of the Department of the Navy. As Secretary, he supervises NAVFAC and is responsible for all official actions taken by the agency. Lehman is being sued here only in his official capacity.

At all times relevant to this action the discriminating official was John Joseph ("Joseph"), a black male. Joseph was employed by NAVFAC as the Command Deputy EEO Officer and head of the NAVFAC EEO office.

In 1979, the position of EEO Specialist in the NAVFAC EEO office became available when David McKellar resigned. The job description sought an assistant to Joseph on overall EEO matters with primary responsibility in the area of the Hispanic Employment Program. Joseph had adver-

tised the position at the GS–11 full performance level but received no applications. He then readvertised the position at the GS–9/11 level. (Defendant's Exhibit 172). The plaintiff was the only applicant for the position, and was selected in December, 1979, as a GS–9 Equal Employment Opportunity Specialist.

In February, 1980, Delgado received a within-grade salary increase from GS–9, Step 02 to GS–9, Step 03. (Stipulations).

In February, 1981, Delgado received a within-grade salary increase from GS–9, Step 03 to GS–9, Step 04. (Stipulations).

In June, 1981, Delgado was promoted from a GS–9 EEO Specialist to a GS–11 EEO Specialist. (Stipulations).

In October, 1981, the Navy instituted its Basic Performance Appraisal Program ("BPAP") for professional employees. Plaintiff was assigned particular tasks (designated as critical elements) to perform under her BPAP. (Stipulations.)

In June 1982, NAVFAC denied plaintiff's within-grade salary increase from GS–11, Step 01 to GS–11, Step 02. (Stipulations.)

The EEO office headed by Joseph had a hostile working environment. (Oral Trial Stipulation).

Joseph has an Associate Degree and has attended two additional years of college. Since June, 1983, Joseph acted as the Deputy EEO Officer. During that time, he kept up with employment discrimination law and gave courses on case analysis.

In June, 1980, and in May, 1981, Joseph gave the plaintiff satisfactory performance appraisals. (Plaintiff's Exhibits 4 and 5).

While Delgado was employed in the NAVFAC EEO office, Joseph had three subordinates, namely Ms. Delgado, EEO Specialist Lena Salazar, and EEO Office Assistant and Secretary Joan Goldberg. All three of these women were hired by Joseph. There were no male employees in the office during the time relevant to this action.

During her tenure in the EEO office, Delgado received recognition in the EEO community. For example, in March, 1980,

she was invited to participate in the preparation of an EEO module for the Navy Automated Civilian Management Information System. (Plaintiff's Exhibit 12). Joseph denied her permission to attend on the grounds that it was inappropriate for an employee of her status to participate.

Also in 1980, the Governor of Puerto Rico personally invited Delgado by name to attend a conference to plan efforts to recruit Hispanics for federal employment. Joseph denied her permission to attend on the grounds that as a subordinate EEO official it was inappropriate for her to participate.

In April, 1980, Delgado was eligible for a promotion to the GS–11 level, however, Joseph refused to promote her at that time. He promoted her fourteen months later and only after the agency's personnel office advised him that he could not justify further delay of her promotion absent a finding of unsatisfactory performance.

Upon becoming a GS–11, Delgado assumed greater responsibilities in the EEO office. Plaintiff was assigned the following BPAP critical elements:

(1) Obtain and coordinate the administration of an attitude survey questionnaire for headquarters personnel;

(2) Prepare and conduct information update/exchange sessions for headquarters EEO counselors, concerning discrimination complaint processing;

(3) Develop and submit in writing a method for evaluating the Hispanic Employment Program aspect of the EEO program;

(4) Prepare a written analysis of Command discrimination complaints in process during fiscal year 1982;

(5) Develop and implement a system for continuous monitoring of discrimination complaints Commandwide;

(6) Prepare and deliver periodic EEO Program progress reports/presentations to Deputy/Assistant Commanders. (Plaintiff's Exhibit 7).

Joseph deliberately interfered with Delgado's performance of her duties under the BPAP critical elements.

Joseph locked his office containing EEO materials that Delgado needed to perform her tasks. She was refused access to these materials without the consent of Mr. Joseph's secretary.

Joseph held mail addressed to the EEO Office on his desk and would not allow it to be distributed to his staff until he was present.

Joseph lost materials, such as reports turned in by his subordinates.

When Delgado would ask Joseph for guidance in the performance of her tasks, he would tell her "you are a GS–11 and should know how to do it." He then would criticize Delgado for seeking outside help and tell her to reread the instructions.

Joseph yelled, screamed and threatened the plaintiff for leaving the office on occasion. He said to her such things as "Okay babe" and "Listen here woman." He used loud and abusive language, and on one occasion said to her, "I'll fix you."

On one occasion, Joseph kicked open the plaintiff's door and on another occasion, he physically prevented her from leaving the room. On yet another occasion, Joseph smoked a cigar and blew the smoke in plaintiff's face, fully knowing that she did not like it.

Joseph harassed and criticized Salazar and Goldberg, as well as Delgado.

Salazar complained to NAVFAC management about Joseph's practice of shouting at her and subjecting her to insults in the presence of others. (Plaintiff's Exhibits 14 and 16). Joseph publicly berated Salazar.

Joseph refused to give Salazar adequate guidance with respect to her work. (Plaintiff's Exhibits 15 and 16).

Joseph agreed that Salazar was a dedicated hard working employee, yet he berated her in office meetings and called her stupid.

Joseph yelled at and berated Goldberg, the EEO office assistant and secretary, and made comments about her slim figure. On one occasion, Goldberg would not acknowledge his "Good morning", and he yelled

and screamed at her "Good morning" several times.

Goldberg was finally successful in transferring out of Joseph's office. Two days before she was transferred, however, Joseph, in violation of regulations, mentioned her by name, as an example of how people could be transferred, during a meeting on employment discrimination law. Goldberg was so upset by Joseph mentioning her transfer that she ran from the office crying hysterically. To calm her, Captain Wells had her assigned some duties in his office for her last two days.

Joseph had also yelled and screamed at and criticized Tina Porter, who worked for Joseph as an EEO Specialist from 1976 through 1978 in San Diego, California. When Porter complained about his abusive treatment, he stated that since she and her female coworkers "behaved like children, [they] would be treated like children." (Porter deposition at Plaintiff's Exhibit 18).

On several occasions, Joseph complained to Jean Lauziere, a Navy manager, that he had "dumb females working for him who couldn't read or write." Obviously he was speaking about Delgado and Goldberg, who were his only subordinates at that time. (Testimony of Lauziere).

Joseph also had problems with women who were not part of his department. For example, in 1982, Claudia Abbott, Assistant to the NAVFAC Inspector General, was talking to Salazar in the hallway when Joseph tried to stick paper down Abbott's blouse. Abbott was offended by this action and Joseph did not apologize.

In 1986, Abbott spoke to Joseph and complained about job harassment. Joseph told her that as long as the person harassing her was not her supervisor, it was not a case of discrimination. He also insinuated that Abbott provoked the harassment. He then told her that to file a discrimination complaint she needed "equal numbers of men and women in the office to prove that an individual [was] discriminating against [her], to prove that he would treat [her] any different, say, than he would a man." (Testimony of Abbott).

Phenton B. Moss, who worked for NAVFAC from 1954 until 1975 as a supply specialist, is a handicapped person. From 1980 to 1984 she was the only black female professional working for her supervisor, Captain Malzahan. She eventually spoke to Joseph about filing a sexual harassment claim against Malzahan. She told Joseph that Malzahan complained about her leaving the office door open because she did not like smoke, and her walking slowly because she had a lung disease.

Moss was also aware that Malzahan had refused to promote her from GS–11 to GS–12. Moss had seen a note from Malzahan indicating that she had been reclassified as a GS–12. The note also stated: "Don't do anything about the position until Moss is gone." Moss testified that she "had never told him that [she] intended to leave or when [she] intended to leave." (Testimony of Moss).

Joseph told Moss that she had no sexual harassment case and could not win because she had petty complaints. Joseph's statements discouraged her from trying to see Admiral Zobel when the harassment worsened. Joseph also told her that "Women think they are being discriminated against and they don't know what discrimination is." Moss's case was subsequently settled by her receiving a retroactive promotion. (Testimony of Moss).

Joseph similarly discouraged Sybil Bittenbring, a NAVFAC employee, from bringing a complaint against her manager by physically touching her and by making lewd remarks to her. Joseph insisted that Bittenbring be more specific in her allegations when she brought the matter to his attention. He asked her to show him exactly where she alleged she was touched by her supervisor and to tell him the comments that her supervisor made. Bittenbring was embarrassed by Joseph's questions. When Bittenbring left the office, Joseph mentioned to Delgado that Bittenbring must have liked the situation because it had been going on for a long time.

The problems in Joseph's office escalated to the point where a meeting was held on December 11, 1981, in Captain Well's of-

fice. Captain James Wells was the Executive Assistant to the Commander of NAVFAC (Admirable Zobel) and Joseph's administrative supervisor. Attending the meeting was Carole Higgins, Navy Employee Relations Specialist responsible for NAVMAT and its subordinate commands. Joseph, Delgado, Salazar and Goldberg also attended. Wells used the meeting to try and clear the air and suggested that everyone have lunch following the meeting. (Testimony of Wells and Delgado).

Wells did not do any follow-up to find out whether the meeting was successful in resolving the problems in the EEO office.

Wells also told Delgado that if she submitted work to Joseph and received no feedback, she had completed her duties. (Tape of Conversation).

Constance Price, who worked in the Strategic Program Office, noticed Joseph use a short and impatient voice with Salazar. She also heard Joseph speak sharply to Goldberg. (Testimony of Price).

Price observed that Joseph treated female deputy EEO personnel as if they were not there. He ignored and interrupted women, but did not interrupt men. Price also noticed Joseph using the terms "babe" and "woman" in a derogatory tone of voice. On December 19, 1979, Price heard Joseph, who was talking to a group, insult Delgado. (Testimony of Price).

In 1981, Price conducted an Inspector General inspection of the EEO office. Five or six women asked to see her to complain about sexual harassment, and told her that they had been discouraged by Joseph from bringing complaints. Joseph sometimes acted in judgment on the claim's merits and suggested that they not file a claim. It is inappropriate for an EEO Officer to pass judgment on the merits of an employee's claim. Price accordingly spoke to Joseph about his discouragement of complaints. (Testimony of Price).

David McKellar was an EEO Specialist who worked for Joseph in 1978. McKellar also felt that he was unprofessionally treated. But unlike the women, he was never threatened, never had cigar smoke blown in his face, and never had paper thrown at

him. On one occasion, Joseph demeaned McKellar because he perceived him as a rival and on another occasion he said "There is a method to my madness."

In September, 1982, Delgado was given notice of unacceptable performance. She was given until November 1, 1982, to meet the specific performance standards. (Defendant's Exhibit 14).

On October 22, 1982, Joseph gave Delgado a memo noting her uncooperative attitude and reminding her of a November 1 deadline. (Defendant's Exhibit 21).

On November 10, 1982, Joseph sent Wells a memo telling him that Delgado had failed to perform critical elements of her BPAP and recommending removal. (Defendant's Exhibit 23).

On November 16, 1982, Wells informed Delgado by memo that he had proposed her removal because of her failure to meet the performance standards of critical elements 3, 4, and 5 of her BPAP. Wells had little contact with Delgado and based his decision to remove her on Joseph's recommendation. (Defendant's Exhibit 24).

On December 13, 1982, Delgado presented an oral and written response to the November 16, 1982 memo proposing removal. (Defendant's Exhibits 28 and 29).

On January 20, 1983, Delgado received Admiral Zobel's Decision Notice on Proposed Removal. Her removal was effective January 21, 1983. (Defendant's Exhibit 31).

Delgado timely filed a discrimination complaint with the agency EEO office. A hearing was held before the EEO examiner on May 6 and 7, 1986, and no decision has been reached.

Delgado filed a timely Complaint in this court.

As to critical element #3 of the BPAP, Joseph gave plaintiff an "ok" on her methodology. He saw the final work product.

As to critical element #4, the plaintiff complied in that a board was posted in her office. Joseph, however, had it removed. Joseph never defined the analysis that was required for critical element #4 and told

Delgado that as a GS–11 she should know what to do.

As to critical element #·5, Joseph would not give plaintiff the mail and materials needed to complete the task.

Joseph intentionally discriminated against women.

## II

### *Discussion*

A. *Disparate Treatment Claim—Discrimination on the Basis of Sex:*

Section 703 of the Civil Rights Act of 1964 (the "Act"), 42 U.S.C. § 2000e–2, prohibits discrimination in employment on the basis of race, color, religion, sex or national origin. The Act specifies that it is unlawful

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a)(1).

In *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the United States Supreme Court established the burden of production and proof analysis required for Title VII actions under a disparate treatment claim. Such a claim requires proof of discriminatory intent, *Washington v. Davis,* 426 U.S. 229, 253–254, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976), and plaintiff must first prove a *prima facie* case by a preponderance of the evidence. A *prima facie* case may be established through a legally mandatory, rebuttable presumption, however, rather than by presentation of enough evidence to permit the trier of fact to reach a conclusion. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1094, n. 7.

■ A plaintiff establishes a *prima facie* case in a Title VII disparate treatment action by showing by a preponderance of the evidence: (1) her membership within a protected class; (2) her discharge and/or denial of promotion; (3) her replacement with or promotion of a person outside the protected group; and (4) her ability to do the job or her qualification for the promotion. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824–1825. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1094 and *Anderson v. City of Bessemer City,* 717 F.2d 149 (4th Cir.1983), *reversed on other grounds,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ In the case at bar, plaintiff has established that she is a member of a protected class by virtue of her sex, that she was discharged from her job at NAVFAC, and that she was qualified to perform the job. There is no evidence, however, of her replacement with a person outside the protected group. A *prima facie* case will nonetheless be established whenever the plaintiff has presented evidence which creates an inference that she was terminated for reasons prohibited by Title VII. *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977) ("The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."). Plaintiff has met her initial burden in this case because she has shown that Joseph treated men and women differently.

Once plaintiff establishes her *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824–1825. The defendant's burden is one of production and is met if the evidence "raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1094–1095; *Board of Trustees v. Sweeney,* 439 U.S. 24, 25 and n.

2, 99 S.Ct. 295, 297 and n. 2, 58 L.Ed.2d 216 (1978); and *Ambush v. Montgomery County Gov't. Dept. of Finance Div. of Revenue*, 620 F.2d 1048, 1054 (4th Cir.1980).

In this case, defendant argues that it had a legitimate, nondiscriminatory reason for discharging plaintiff, namely that Delgado failed to satisfy the minimum requirements of Critical Element numbers 3, 4, and 5 of her BPAP. The court, however, finds that plaintiff did comply with the Critical Elements of her BPAP to the extent Joseph permitted her to complete her tasks.

■ The parties stipulated that the EEO office suffered from a hostile working environment, and the court finds that Joseph was the cause of such hostility. Having created a hostile working environment, defendant cannot complain that Delgado failed to perform. "An employer cannot use an employee's diminished work performance as a legitimate basis for removal where the diminution is the direct result of the employer's discriminatory behavior." *Henson v. City of Dundee*, 682 F.2d 897, 910 (11th Cir.1982) *and Weiss v. United States*, 595 F.Supp. 1050, 1057 (E.D.Va. 1984). The court finds that any inability of Delgado to adequately perform the Critical Elements of her BPAP was due to Joseph's discrimination against women. Joseph deliberately interfered with Delgado's execution of her duties by refusing her access to necessary mail and materials, by refusing to give her supervisory guidance on completion of various tasks, and by undermining what progress Delgado managed to make. The court found Joseph's testimony regarding Delgado's abilities less than credible.

Accordingly, defendant has not articulated either a legitimate or a nondiscriminatory reason for plaintiff's treatment. The ultimate burden of persuasion, of course, remains with the plaintiff at all times. *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. In this case, the court finds that plaintiff has met her burden of persuasion. She made out a *prima facie* case of discrimination, which defendant failed to rebut with evidence of legitimate nondiscriminatory reasons for her termination. Joseph intentionally discriminated against women, and that discrimination resulted in a hostile working environment which prevented plaintiff from fully completing her assigned tasks. Any allegation by defendant that plaintiff failed to perform is at best pretextual.

### B. *Sexual Harassment Claim:*

■ Title VII of the Civil Rights Act of 1964 also prohibits sexual harassment. A plaintiff may establish a violation of the Act by proving that discrimination based on sex has created a hostile or abusive work environment. *Meritor Savings Bank, F.S.B. v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

The Supreme Court held that, for sexual harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment." *Vinson*, 106 S.Ct. at 2406. The Court emphasized that:

Sexual harassment which creates a hostile or offensive environment for members of one sex is every bit the arbitrary barrier to sexual equality at the workplace that racial harassment is to racial equality. Surely, a requirement that a man or woman run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living can be as demeaning and disconcerting as the harshest of racial epithets.

*Vinson*, 106 S.Ct. at 2406.

In order to prove such sexual harassment, plaintiff must establish the following:

First, the plaintiff must make a *prima facie* showing that sexually harassing actions took place, and if this is done, the employer may rebut the showing either directly, by proving that the events did not take place, or indirectly by showing that they were isolated or genuinely trivial.

Second, the plaintiff must show that the employer knew or should have known of the harassment, and took no effectual action to correct the situation. This showing can also be rebutted by the em-

ployer directly, or by pointing to prompt remedial action reasonably calculated to end the harassment.... *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983). The burden of proof on a sexual harassment claim ultimately rests upon the plaintiff. *Katz*, 709 F.2d at 256, n. 7.

■ Plaintiff has easily proved in this case that sexually harassing actions took place. Sexual harassment need not take the form of overt sexual advances or suggestions, but may consist of such things as verbal abuse of women if it is sufficiently patterned to comprise a condition and is apparently caused by the sex of the harassed employee. *McKinney v. Dole*, 765 F.2d 1129, 1138 (D.C.Cir.1985).

■ In this case, both sides are in agreement that there was a hostile working environment. It is quite obvious to the court that the hostile environment was created by Joseph, who was trying to protect his turf and who viewed women as threats. He was consistently abusive towards women, called them "babes," and used the term "woman" in a derogatory manner. On many occasions he told the plaintiff that she was a GS–11 and should know how to do her job. He gave her very little guidance and instead went out of his way to demean her. Moreover, he treated men and women differently. On occasions, as indicated by Price, he was not as polite to women in conversations as he was to men. He would act as if women were not present, whereas he would allow men to speak without interrupting them. Generally, his treatment of women was unprofessional and discriminatory. (Testimony of Price).

Plaintiff has also established that Joseph's harassment of her was not "isolated or genuinely trivial." *Katz v. Dole*, 709 F.2d at 256. Joseph's abusive treatment extended to other subordinates as well as Delgado. He harassed Salazar and Goldberg, to the point where Goldberg was forced to transfer out of the office, by publicly berating and demeaning them. His discriminatory conduct began as early as 1976, when Tina Porter experienced similar problems to those of the plaintiff. The testimony of Joseph's subordinates, Delgado, Salazar and Goldberg, was more believable than Joseph's, and was supported by the credible testimony of Price, Abbott and Moss.

Moreover, the record is replete with his derogatory attitude toward and remarks about other women. Joseph, in violation of EEO regulations, discouraged five or six women from bringing discrimination complaints. He passed judgment on the merits of their complaints, gave them little guidance on how to prevent harassment or sexual discrimination, and insinuated that they provoked the harassment.

Additionally, Claudia Abbott testified to a more overt incident of sexual harassment. Joseph stuffed a piece of paper down Abbott's blouse while she was standing in the office hallway, and never apologized. Later, when Abbott brought a discrimination complaint to Joseph's attention, he implied that Abbott brought the harassment on herself and he discouraged her claim. Taken together, these incidents establish a continuing pattern of discrimination against women by Joseph.

It is ironic that the harassment that took place was by Joseph, the head of the EEO office whose assignment was to prevent harassment and violations of Title VII. However, this court feels that the record shows his intentional discrimination against women. Having created the hostile working environment adverse to women, defendant cannot complain about plaintiff's diminished job performance. Joseph's harassment was the cause of plaintiff's inability to work. *See Weiss*, 595 F.Supp. at 1057.

Plaintiff has also established the necessary knowledge by her employer. The NAVFAC management was aware of the harassment that had taken place and refused to take appropriate action. On December 11, 1981, there was a meeting in Captain Wells' office to discuss the hostile working environment in the EEO office. No follow-up was conducted by Wells or any other supervisor to determine whether the hostile environment had dissipated.

The employer must do more than merely "indicate the existence of an official policy against such harassment. When the employer's supervisory personnel acquiesced and participated in such harassment, the burden on an employer seeking to avoid Title VII liability is especially heavy." *Katz v. Dole,* 709 F.2d 251, *cited in Weiss,* 595 F.Supp. at 1057. Here, Captain Wells was clearly aware of the problems created by Joseph, and the only action taken was a meeting of the department. Wells never checked to determine if his suggestions made at that meeting were followed.

Accordingly, the court finds that plaintiff has met her burden and established that defendant discriminated against plaintiff concerning the conditions of her employment because of her sex, in violation of Title VII.

### III

*Conclusions of Law*

The court has jurisdiction to decide this case pursuant to 42 U.S.C. § 2000e–16, Title VII of the Civil Rights Act of 1964, as amended.

The plaintiff has proven that she was subjected to a pervasive pattern of sexual harassment and intentional discrimination directed at her because of her female gender and that this action significantly impaired her ability to perform satisfactorily as an EEO Specialist.

An appropriate order shall issue.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is accordingly

ORDERED:

(1) that Judgment be, and it hereby is, ENTERED in favor of the plaintiff and against the defendant on plaintiff's Complaint of Unlawful Discrimination in Employment;

(2) that, as this Order decides only liability, the plaintiff shall file a brief in support of remedies, and counsel fees and costs by April 9, 1987, and the defendant shall file a brief in opposition by April 24, 1987;

(3) that the clerk shall forward copies of this Order together with the accompanying Memorandum Opinion to all counsel of record.