Jennifer VENTERS, Plaintiff–Appellant,

v.

CITY OF DELPHI and Larry Ives, Defendants–Appellees.

No. 96–1355.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 9, 1996.

Decided Aug. 19, 1997.

James V. McGlone, Laura L. Bowker (argued), Stuart & Branigin, Lafayette, IN, for Plaintiff–Appellant.

Gary K. Matthews (argued), Enslen, Enslen & Matthews, Hammond, IN, Robert G. Vann, Hodges & Davis, Merrillville, IN, for City of Delphi.

Gary Matthews, Enslen, Enslen & Matthews, Hammond, IN, John C. Ruckelshaus, Ruckelshaus, Roland, Hasbrook & O'Connor, Indianapolis, IN, Robert G. Vann, Hodges & Davis, Merrillville, IN, for Larry Ives.

Before BAUER, ROVNER, and DIANE P. WOOD, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

After she was fired from her position as a radio dispatcher for the police department of Delphi, Indiana, Jennifer Venters sued the city and its Police Chief Larry Ives on the grounds that the discharge violated her rights to freedom of speech, religion, and association under the First Amendment, and that the discharge as well as the treatment she had endured during her employment with the city amounted to religious discrimination under Title VII of the Civil Rights Act of 1964, as amended. The district court entered summary judgment against Venters on all of her claims. The court determined that Venters' free speech claim was barred by the statute of limitations, and that her freedom of association claim did not involve a type of association that was constitutionally protected. The court further held that Venters had failed to point to any conduct on her part that would qualify as the exercise of a religious belief entitled to First Amendment protection, thus precluding her freedom of religion claim as well. Finally, the court determined that her Title VII claim was also foreclosed because Venters never informed Ives of her religious beliefs and did not request that those beliefs be accommodated.

On appeal, Venters has challenged the district court's judgment only with respect to her freedom of speech, religion, and Title VII claims. For the reasons that follow, we affirm the judgment in part and reverse in part.

## I.

 We review de novo the grant of summary judgment in defendants' favor, construing the evidence in the light most favorable to Venters and according her the benefit of all reasonable inferences that may be drawn from it. *Cliff v. Board of School Comm'rs of Indianapolis*, 42 F.3d 403, 408 (7th Cir.1994); *Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir.1994). Although Ives and the City of Delphi bear the initial burden of demonstrating that there is no genuine issue of material fact requiring trial, once they have done so, the burden shifts to Venters to point to evidence in the record that would allow a rational trier of fact to find in her favor on a material question. *Cliff*, 42 F.3d at 408. As the case law uniformly emphasizes, in the absence of evidence presenting a factual issue on a material question, Ives and the city are entitled to summary judgment. *E.g., id.* at 409. Yet in examining the evidence presented by Venters, we must keep in mind that summary judgment is proper only if Ives and the City of Delphi "would have been entitled to a directed verdict had the record before the court been that of a trial—in other words, only if judgment as a matter of law would have been appropriate because no reasonable jury could have returned a verdict for the plaintiff." *Fuka v. Thomson Consumer Elecs.*, 82 F.3d 1397, 1402 (7th Cir.1996); *see Dey*, 28 F.3d at 1453.

Consistent with these principles, the factual summary that follows reflects a reading of the record uniformly favorable to Venters. *See, e.g., Auston v. Schubnell*, 116 F.3d 251, 252 (7th Cir.1997), citing *Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344 (7th Cir.1996); *see also Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 656 (7th Cir.1991) (en banc). Needless to say, it remains for a jury (which Venters has requested) to decide whether and to what extent her account of events is accurate.

Venters was employed by the City of Delphi as a radio dispatcher from March 1986 until her dismissal by Police Chief Ives on October 20, 1994. Venters was hired during the tenure of former Mayor Carolyn Wagner and served under the direction of former Police Chief Rolland Richard Roe, who left the Delphi police department when a new mayor took office in January 1992. Immediately prior to leaving his post in December 1991, Roe promoted Venters to the position of head dispatcher. As a radio dispatcher, Venters' duties included answering emergency calls that came to the police station by telephone or police radio, then dispatching the appropriate response. This could include alerting the police or the fire department to the call and directing an ambulance to the scene of an injury, and providing emergency teams with the information they needed to respond effectively. In addition, Venters was responsible for monitoring alarms, logging her calls, and aiding members of the public who came to the police station for assistance. She described herself as "the link between the public and the law enforcement officers," and acknowledged that if she were ineffective in taking calls and dispatching the proper response team to an emergency, lives could be lost.

In June 1992, approximately six months after taking office, Mayor Thomas S. Deiwert chose Ives as a permanent replacement for the former police chief. From the beginning of his tenure, Ives made it clear to Venters that he was a born-again Christian who believed that his decisions as police chief should be guided by the principles of his faith, and that he had been sent by God to Delphi to save as many people from damnation as he could. In his conversations with Venters, all of which occurred at work while Venters was on duty, Ives continuously interjected religious observations and quotations from the Bible, and spoke to Venters about her salvation in a manner that led her to conclude that Ives considered her immoral. Specific examples of statements of this nature that Ives made to Venters include: (1) that to be a good employee, a person had to be spiritually whole, and to be spiritually whole, a person had to be saved; (2) that Venters needed to pay attention when people were ministering

to her because a person had a limited number of chances in their lifetime to accept God and be saved, and that Venters might be running out of chances; (3) that all individuals were surrounded by spirits, and that Venters' "positive spirits" were doing battle with her "negative spirits;" (4) that if Venters were to attend Ives' church, the Assembly of God, she might feel the "altar call" and be saved; (5) that the police station was "God's house," and that if Venters were unwilling to play by God's rules Ives would "trade" her. At certain points, Ives criticized Venters for living with another single woman, and asserted that she had set a bad moral example for the other woman's teenaged son. Ives also warned Venters that, because she was a single woman, it was inappropriate for her to receive visits from police officers who were married, including those who were separated from their wives. Ives further inquired whether there was any truth to the rumors that Venters had entertained the police officers who visited her home with sexually explicit videos and other pornographic materials.

In an effort to save her soul, Ives provided Venters with a copy of the Bible and other religious materials, and called her attention to a religious videotape entitled "Hell's Fire and Heaven's Gate," which Ives had placed with the police department's training materials. Interspersed with these religious lectures were numerous references to Venters' status as an at-will employee who, as Ives reminded her, could be dismissed at any time. Although Venters considered these religious lectures unwelcome, she was afraid to express her desire to be left to her own religious views, and at times even tried to appear interested in Ives' conversation and to ask questions about his faith in order to placate him. Venters testified that she refrained from making her religious views known to Ives because she believed that if she had contradicted Ives or asked him to stop lecturing her, she would have risked being discharged from her job.

Venters' first job-related (as opposed to religious) conflict with Ives and Diewert occurred soon after Diewert took office, and involved Venters' opposition to a plan to convert to a system of centralized dispatching between the City of Delphi police department and the Carroll County Sheriff's Department. Both Diewert and Ives were strong proponents of the plan, and repeatedly cautioned Venters not to speak to members of the city council about her views concerning the feasibility of converting to the centralized system. Venters nevertheless did so, speaking to council members at their homes or in other private settings. In late September 1992, the proposal came up for a vote before the city council. At a council meeting held before the vote, Diewert and Ives spoke in favor of the proposal, and Venters joined Officer Brook McCain, a police officer who had been designated to present the views of his fellow officers, to argue against the plan. The proposal was ultimately defeated, a result which apparently angered Ives. Ives testified in his deposition that although he did not regard Venters' actions as being a violation of departmental procedure, strictly speaking, he did believe that her decision to "break the chain of command" and speak privately to members of the city council about centralized dispatching was highly discourteous.

Approximately two weeks after the city council voted against adopting the centralized dispatching system, Ives hired a new dispatcher, Jodie Tully. Tully had not had previous dispatching or law enforcement experience, yet within a matter of several days she was assigned to supervise Venters. Venters, in turn, was demoted from her position as head dispatcher, was reassigned to work the night shift, and received an unspecified pay cut. Although Venters acknowledges that during the summer and early fall of 1992, she was suffering from extreme exhaustion due to an unreasonable work load, she nevertheless insists that she did not ask to be demoted or transferred to the night shift to relieve her of some of her responsibilities. In any event, by mid-October 1992, Venters requested and was granted medical leave to obtain treatment for fatigue, major depression, and intermittent high blood pressure.

When Venters returned to work in February 1993, Ives warned her never to bring up the issue of centralized dispatching again, in a tone of voice that caused Venters to think that she would be fired from her job if she

were to continue discussing her views on the matter while at work. Ives' religious harangues then began in earnest. In addition to repeatedly sounding the themes of damnation and salvation that have already been described, Ives commented that the heart ailment of a city council member who had opposed him was a sign of God's displeasure, and that if the council member did not mend his ways he risked being turned over to Satan. At some point, Ives suggested to Venters that she consider spiritual counseling with a group in Kokomo, Indiana, that offered "cult deprogramming." Ives also continued to urge Venters to attend church with him, and to attend performances of the Christian rock group, "The Peacemakers," which might lead to her hearing God's call to be saved.

Matters came to a head on February 14, 1994, when Ives called Venters into his office and asked if she had attended church services the previous Sunday. When Venters admitted that she had not, Ives told her that she had a choice to follow God's way or Satan's way, and that she would not continue working for Ives if she chose the latter. Ives then began talking about Venters' sinful life and the disgust he felt toward her because of her obstinate refusal to be saved, indicating to Venters that he believed she was repeating a cycle of abuse she had experienced as a child with her family. Ives told Venters that after having observed her behavior, he became convinced that she had had sexual relations with family members and perhaps even animals, and that she was sacrificing animals in Satan's name. Ives also suggested to Venters that suicide would have been preferable to her continuing a life of sin, and that he would not allow the "evil spirit that had taken [Venters'] soul" to continue to live in the police department. At that point, Venters told Ives that he had "crossed the line," and that if he did not maintain a professional attitude toward her in all future conversations, she would consider filing a sexual harassment lawsuit against him. Venters also told Ives that if he did intend to fire her, he had better have a legitimate reason for doing so because she was willing to fight the dismissal in court. Ives then replied that no one's job performance is perfect, and that he

would get the proof he needed to "put the handcuffs on her himself."

Within one or two days of the conversation, Venters told Officer McCain and former Chief Roe about what Ives had said to her. Roe advised Venters to make a written memorandum of all that she could remember of the conversation, and to provide him and City Council President Carolyn Pearson with copies. Venters took Roe's advice and prepared the memorandum. The following morning, Venters had occasion to meet with Pearson to discuss the situation with her and give her a copy of the memorandum. Although Pearson expressed sympathy, she stated that she was powerless to help Venters because Ives reported to the Mayor, and the city council had no authority to discipline him. Pearson also believed that if she were to approach Mayor Deiwert about the problems Venters was having with Ives, it could cost Venters her job. She therefore advised Venters to "keep [her] distance" from Ives and to avoid personal conflicts with him. Pearson further advised Venters that the memorandum was only her word, and warned her that if confronted with the memorandum, Ives would in all likelihood deny Venters' story. Shortly after her meeting with Pearson, Venters also told city council member Bill Miller about what had happened, but did not show him the memorandum. Miller suggested that Venters file a lawsuit against Ives. At this juncture, however, Venters did not seek legal advice, nor did she share the memorandum with Ives or Deiwert.

Venters contends that Ives' religious proselytizing continued unabated up until the time of her discharge on October 20, 1994, although she provides no further specific examples of statements that Ives made to her following the February 14, 1994 incident. On October 20, Ives met with Venters and informed her that she was being fired because of her deficient performance as a dispatcher, citing three specific examples. These were: (1) Venters had failed to monitor or to respond to fire department radio calls; (2) Venters had shown disrespect for Fire Chief Wilmer Schock and other members of the fire department, and had made an obscene

gesture to a firefighter, described as giving him "the finger;" and (3) Venters was generally resistant to change, and in particular, had continued to write telephone messages on stray pieces of paper instead of using the telephone message pad as Ives had asked her to do on two separate occasions. Ives provided Venters with two examples of telephone messages she had written down on slips of paper, one of which apparently contained the wrong date. Ives testified that Venters appeared astonished that he would consider this particular lapse significant, despite the fact that he had carefully explained to her that the message pad automatically made carbon copies of all messages, and thus created its own log of all incoming telephone calls. During this meeting, Ives also presented Venters with a "Reason for Leaving Document" listing these three reasons for her dismissal. Venters refused to sign the document.

Although Ives claims that at the time he dismissed Venters, he showed her the written complaints against her that he had received from members of the fire department, Venters disputes that she was provided with any documentation of her alleged faults. Venters also maintains she was never shown the logs or the tapes of the fire department radio calls that she had allegedly missed, and that if she did miss any calls, she had done so unintentionally. Venters further testified that any such lapse on her part was undoubtedly due to defects in the fire radio system, and that approximately six weeks after her discharge she observed a repairman come to the station to work on the radio. Although Venters acknowledges that for several years she and Chief Schock harbored a mutual dislike for one another, she testified that she "overlooked" that dislike in order to do her job. Venters flatly denied that she ever made an obscene gesture to Schock or any other firefighter, and claimed that she was always respectful toward members of the fire department. Concerning her refusal to accept the changes in police department procedure that Ives had espoused, Venters admits that she had regretted the departure of former police chief Roe, and concedes that she was at first reluctant to adopt all of the changes that Ives had ordered. Yet Venters maintains that during her final year of employment, she made every effort to comply with Ives' directives because she believed he was looking for a reason to fire her. Venters also contends that her early reluctance to acquiesce in the change in department leadership was not extraordinary, but was shared by other employees, and that her initial reaction to Ives' appointment did not distinguish her from others under Ives' command who were not subjected to religious harassment or discharged for their views. Finally, although she maintains that she was a competent dispatcher, Venters asserts that any other deficiencies in her work performance, such as her allegedly "bad attitude" on the job, were the direct result of the hostile environment Ives had created with his relentless proselytizing.

Following her dismissal, Venters filed a timely charge of discrimination with the Equal Employment Opportunity Commission and received a right-to-sue letter. She then filed a complaint in federal district court, which was later amended, alleging that Ives and the City of Delphi had deprived her of her First Amendment rights in violation of 42 U.S.C. § 1983, and that they had curtailed her employment opportunities, adversely affected her status as an employee, and ultimately discharged her on the basis of her religion, all in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1). Although this argument was apparently never developed, Venters' complaint also contained an allegation that the defendants had discriminated against her in retaliation for her opposition to their unlawful employment practices in violation of Title VII, 42 U.S.C. § 2000e–3(a). Venters sought compensatory and punitive damages and attorneys' fees from the defendants, as well as a jury trial on all of her claims. After a hearing on the defendants' motion for summary judgment, the district court entered judgment in favor of Ives and the City of Delphi on all of Venters' claims. This appeal followed.

**II.**

Venters initially challenges the dismissal of her First Amendment freedom of speech and freedom of religion claims. (She does not challenge the dismissal of her freedom of

association claim.) As we have noted, the district court dismissed the speech claim as barred by the statute of limitations, and the religion claim for lack of evidence that Venters had ever attempted to exercise her own religious beliefs. For the reasons we shall discuss in a moment, we do not agree that summary judgment was warranted on these grounds as to the claims against Ives in his individual capacity. But first we take up Venters' claims against the city, as to which we believe summary judgment was appropriate for a different reason.

## A.

Before the city may be held liable for the constitutional violations Venters has alleged, she must demonstrate that these violations occurred pursuant to municipal policy or custom. *Monell v. Department of Social Servs. of City of New York*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). Venters has attributed virtually all of the constitutional infractions she asserts—her demotion, the religious lectures, and ultimately her discharge—to Chief Ives. Absent evidence that Ives was acting in accord with city policy in taking these actions, or that his actions were ratified by others in the city who were empowered to make municipal policy (*see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988) (plurality))—and the record discloses no adequate evidence in this regard—Venters must show that Ives himself qualifies as a policymaker, such that his actions may themselves be deemed to reflect the official policy of Delphi. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84, 106 S.Ct. 1292, 1299–1300, 89 L.Ed.2d 452 (1986) (plurality); *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924. Whether

the individual immediately responsible for the constitutional violation possesses policymaking authority is a question that turns on state law. *Pembaur*, 475 U.S. at 483, 106 S.Ct. at 1300; *Praprotnik*, 485 U.S. at 124–25, 108 S.Ct. at 924–25. Venters directs us to no Indiana law nor to any evidence suggesting that as the Chief of Police, Ives enjoyed the authority to establish official policy on behalf of Delphi or that he was delegated that authority by another official who did. It is, of course, apparent from the evidence that Venters has presented that Ives did possess the power to hire, fire, demote, and otherwise manage the people who worked in his department, including Venters. But that authority is distinct from the authority to make policy for the city. *See Radic v. Chicago Transit Auth.*, 73 F.3d 159, 161 (7th Cir.), *cert. denied*, ––– U.S. –––, 116 S.Ct. 2505, 135 L.Ed.2d 195 (1996); *Gillette v. Delmore*, 979 F.2d 1342, 1349–50 (9th Cir.1992) (per curiam), *cert. denied*, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993). Without a showing that the asserted constitutional violations were attributable to municipal policy or custom, Venters could not prevail. For that reason, we believe that the city was entitled to summary judgment as to Venters' constitutional claims.[1]

## B.

Venters has sued not only the city for the constitutional violations, but Ives in his individual capacity as well. Ives need not be shown to have acted according to municipal policy or custom to be held liable under section 1983 (*see Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Gray v. Lacke*, 885 F.2d 399, 406 (7th Cir.1989), *cert. denied*, 494 U.S. 1029, 110 S. Ct. 1476 (1990)),[2] and thus we

1. We realize that this is not an issue that the city pursued below. It did, however, squarely present the issue in its brief on appeal, without any contention by Venters in her reply that the city had waived this argument. *See Doe v. United States*, 51 F.3d 693, 699 (7th Cir.) (waiver can itself be waived by failure to object), *cert. denied*, ––– U.S. –––, 116 S.Ct. 205, 133 L.Ed.2d 139 (1995); *Colburn v. Trustees of Indiana Univ.*, 973 F.2d 581, 588–89 (7th Cir.1992) (same). At our invitation, Venters' counsel did address this question briefly at oral argument; but we are not convinced that the evidence in this case would reasonably support the inference that city offi-

cials with policymaking authority ratified the challenged actions of Ives, as her counsel argued. As that is the sole basis on which Venters has asserted that the city could be held liable, we are satisfied that the city was entitled to summary judgment.

2. Venters need only show that Ives was acting under color of state law (*Graham*, 473 U.S. at 166, 105 S.Ct. at 3105; *Gray*, 885 F.2d at 406), and there is no dispute here that he was. *See* Tr. Jan. 19, 1996 at 4 ("There isn't any question that we have got state action here.").

must separately consider whether the district court properly dismissed Venters' First Amendment claims against Ives. For the reasons that follow, we conclude that the court erred in granting summary judgment in favor of Ives on these claims.

### 1. Freedom of Speech

A municipal employee has the right to speak out on matters of public concern, provided that her interest in speaking is not outweighed by her employer's interest in effectively carrying out its public responsibilities. *See generally Pickering v. Board of Educ. of Tp. High School Dist. 205*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968); *Connick v. Myers*, 461 U.S. 138, 150–51, 103 S.Ct. 1684, 1692, 75 L.Ed.2d 708 (1983). Venters contends that Ives improperly penalized the exercise of her right to free speech when he demoted her from the position of head dispatcher after she spoke out against the proposal for a centralized dispatch system that Ives and the Mayor of Delphi both supported.

The district court held this claim barred by the statute of limitations. Section 1983 borrows its statute of limitations from state law. *Palmer v. Board of Educ. of Community Unit School Dist. 201–U*, 46 F.3d 682, 684 (7th Cir.1995); 42 U.S.C. § 1988(a). In Indiana, the pertinent limitations period (that for personal injury actions) is two years. *Campbell v. Chappelow*, 95 F.3d 576, 580 (7th Cir.1996); *Coopwood v. Lake County Community Dev. Dep't*, 932 F.2d 677, 678–79 (7th Cir.1991). Venters was demoted purportedly in retaliation for her speech in the Fall of 1992. Yet, she did not file her original complaint until January 31, 1995, concededly after the statute of limitations expired. Nonetheless, Venters maintains that it was inappropriate for the district court to invoke the statute of limitations on summary judgment, given that the defendants had not raised it in their answer to the complaint and she had not been given the

opportunity to address the issue after it belatedly surfaced in the summary judgment briefing below.[3] We agree.

Federal Rule of Civil Procedure 8(c) requires a defendant to plead a statute of limitations defense and any other affirmative defense in his answer to the complaint. The purpose of that rule, as courts have long recognized, is to avoid surprise and undue prejudice to the plaintiff by providing her notice and the opportunity to demonstrate why the defense should not prevail. *Blonder–Tongue Labs., Inc. v. University of Illinois Found.*, 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971); *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 235 (7th Cir.1991); *see also, e.g., Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 593 (1st Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 51, 133 L.Ed.2d 16 (1995); *Ball Corp. v. Xidex Corp.*, 967 F.2d 1440, 1443–44 (10th Cir.1992); *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir.1989); *Perez v. United States*, 830 F.2d 54, 57 (5th Cir.1987). Of course, as with other pleadings, the district court has the discretion to allow an answer to be amended to assert an affirmative defense not raised at the outset. Fed. R. Civ. P. 15(a); *see* 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1278 at 494–95 (2d ed.1990). The pertinence of a particular defense may only become apparent after discovery, for example, in which case it would be reasonable for the court to permit the belated assertion of that defense. Nonetheless, the defendant remains obligated to act in timely fashion. *See Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir.1987) (statute of limitations defense must be raised "at the earliest possible moment") (internal quotation marks and citations omitted); *Home Depot, Inc. v. Guste*, 773 F.2d 616, 621 n. 4 (5th Cir.1985). Once the availability of an affirmative defense is reasonably apparent, the defendant must alert the parties and the court to his intent to pursue that defense.

---

**3.** Alternatively, Venters argues that her claim was timely because it was premised upon Ives' continuing violation of her right to express her views on the subject of centralized dispatching. She also briefly makes the argument that Ives' admonition in February 1993 that she was not to discuss that subject again constituted a fresh injury for which she can sue regardless of whether her demotion claim survives the statute of limitations. Because we agree with Venters that the statute of limitations was invoked too late in the summary judgment process to permit the court to rely on it, we need not consider the merits of these alternative arguments.

968

"A defendant should not be permitted to 'lie behind a log' and ambush a plaintiff with an unexpected defense." *Perez*, 830 F.2d at 57, quoting *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir.1987); *see also Bettes v. Stonewall Ins. Co.*, 480 F.2d 92, 94 (5th Cir. 1973). The appropriate thing for the defendant to do, of course, is to promptly seek the court's leave to amend his answer. *See De-Valk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir.1987), quoting *Mason v. Hunter*, 534 F.2d 822, 825 (8th Cir.1976). His failure to do risks a finding that he has waived the defense. *See Metropolitan Housing Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1287 (7th Cir.1977) ("A claim that the statute of limitations bars a lawsuit is an affirmative defense, and it must be pleaded or it will be considered waived.") (footnote omitted), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *see also, e.g., Johnson v. Sullivan*, 922 F.2d 346, 355 (7th Cir.1990) (en banc); *Carroll v. Acme–Cleveland Corp.*, 955 F.2d 1107, 1115 (7th Cir.1992); *Pinto Trucking Serv., Inc. v. Motor Dispatch, Inc.*, 649 F.2d 530, 534 (7th Cir.1981); *Stanish v. Polish Roman Catholic Union of America*, 484 F.2d 713, 721 (7th Cir.1973); *Roe v. Sears, Roebuck & Co.*, 132 F.2d 829, 832 (7th Cir. 1943); 5 Wright & Miller, § 1278, at 477–89 & nn. 1–13 (2d ed. 1990 & Supp.1997) (collecting cases).

■ We conclude that the defendants did waive their statute of limitations defense in this case. They did not include that defense in their answers to the original and amended complaints. R. 8, 29. In fact, the first and only mention of the statute of limitations came in their reply memorandum in support of the motion for summary judgment, submitted a year after the case was filed. R. 53 at 5–6. (No request was made for leave to amend the answer.) We can discern no justification for the delay. The defendants argue that not until Venters had filed her memorandum in opposition to the motion for summary judgment did they realize that her speech claim was based solely on her 1992 opposition to the centralized dispatch proposal. Appellees' Br. at 42–43. Yet, the centrality of her public remarks on that topic to her free speech claim is plain from the face of her amended complaint (R. 24 at 3–4 ¶¶ 6–

7), and for that matter from the face of her original complaint (R. 1 at 3–4 ¶¶ 6–7). Both complaints also noted that the proposal for a centralized dispatch system was debated and resolved in the Fall of 1992, plainly putting the defendants on notice that there was a potential statute of limitations defense to any claim that Ives retaliated against Venters for speaking publicly about that subject. This explanation for the delay in raising the limitations question simply does not wash.

It is true enough, as the defendants point out, that appellate courts are not inclined to find a technical failure to comply with Rule 8(c) fatal when the district court has chosen to recognize a belatedly asserted affirmative defense, so long as the record confirms that the plaintiff had adequate notice of the defense and was not deprived of the opportunity to respond. *Blaney v. United States*, 34 F.3d 509, 512–13 & n. 3 (7th Cir.1994) (collecting cases); *see also Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir.1993) (same). In effect, these cases recognize that the failure to plead an affirmative defense can be harmless, notwithstanding the terms of Rule 8(c) and the many cases finding waiver when the defense is not raised in the answer.

■ This case does not warrant invocation of that forgiving line of authority, however. By omitting mention of the statute of limitations until they filed their reply memorandum, the defendants deprived Venters of any reasonable opportunity to address that defense. At that juncture, the parties had largely completed an exhaustive discovery process, and the scheduled trial date was only a month away. The reply itself was filed on the eve of oral argument before the district court, and it is undisputed that plaintiff's counsel did not receive a copy of the reply until the morning of argument and that she had to read it while en route to Lafayette for the argument that afternoon. At the conclusion of the argument, counsel drew the district court's attention to the fact that the reply raised a number of new issues and requested leave to file a surreply. Tr. Jan. 19, 1996 at 45–46. That request was denied, although the court did grant her one business day in which to designate additional

evidentiary materials pertinent to the summary judgment motion. *Id.* at 45, 46; *see* R. 57. When the district court subsequently relied on the statute of limitations in granting the defendants summary judgment on the free speech claim, it did not consider the evident prejudice to Venters in doing so. *See* Mem. & Order at 6–7. We cannot overlook the failure to comply with Rule 8(c) in this context. Intentionally or not, Venters was bushwacked. We recognize that the limitations defense may have been meritorious; and Venters' counsel should have had some inkling that the defense *might* be raised given the date that her own allegations placed on the events central to her free speech claim. But it was not Venters' obligation to raise the defense, and if Rule 8(c) is not to become a nullity, we must not countenance attempts to invoke such defenses at the eleventh hour, without excuse and without adequate notice to the plaintiff. *See Maul v. Constan*, 928 F.2d 784, 786 (7th Cir.1991) ("We ... will not speculate as to how the case would have proceeded had the correct procedure been followed."); *Roe*, 132 F.2d at 832 (summary judgment reversed where statute of limitations defense not raised in answer and defendant never sought district court's leave to correct omission by amendment). The statute of limitations has been waived.

The statute of limitations was (and is) the sole basis urged for the entry of summary judgment in favor of Ives on this claim.

Having found that defense waived, we must return this claim to the district court for trial.

2. Freedom of Religion (Free Exercise and Establishment Clauses of First Amendment)

 Venters asserts that Ives' conduct as a public official violated her rights under the establishment[4] and free exercise clauses of the First Amendment. Although these two clauses constitute distinct protections, they also embody "correlative and coextensive ideas, representing only different facets of the single great and fundamental freedom [of religion]." *Everson v. Board of Educ. of Ewing Tp.*, 330 U.S. 1, 40, 67 S.Ct. 504, 523, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting). Consequently, "[a]ny attempt to formulate a bright-line distinction is bound to founder." *McGowan v. Maryland*, 366 U.S. 420, 463, 81 S.Ct. 1153, 1155, 6 L.Ed.2d 393 (1961) (Frankfurter, J., concurring). But for purposes of our analysis, the following observations will suffice. Broadly speaking, the establishment clause prohibits both the national government and, through the operation of the Fourteenth Amendment, the states, from compelling an individual to participate in religion or its exercise, or otherwise from taking action that has the purpose or effect *of promoting religion or a particular religious faith. Lee v. Weisman*, 505 U.S. 577, 587, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992); *Lynch v. Donnelly*, 465 U.S. 668, 678, 104

---

**4.** We find no merit to the defendants' contention that Venters waived any establishment clause claim by failing to raise it below. The allegations of Venters' complaint quite clearly fall within the reach of the establishment clause as well as the free exercise clause, and Venters did not purport to limit her claims to one clause or the other. The coercive aspect of the conduct that underlay Venters' First Amendment claims was clear from the outset of the case (*see, e.g.,* Amended Complaint, R. 24 at 2–5 ¶¶ 3–5, 9, 12), and as we noted in *Kerr v. Farrey*, 95 F.3d 472, 479 (7th Cir.1996), "in general, a coercion-based claim indisputably raises an Establishment Clause question." The district court's opinion itself recognized the allegations of coercion. Mem. & Order at 9 ("Venters has alleged that because her religious views did not coincide with Ives' and that she was not willing to conform to his religious views, her employment with the City of Delphi was terminated."). Yet, the court, like the defendants, proceeded to characterize Ven-

ters' claim as a free exercise claim alone. *Id.* We agree that Venters could have been clearer as to the dual nature of her allegations, but her counsel did point out at oral argument on the summary judgment motion that "there is also an establishment clause issue in this case, since this ... was a public employer, a governmental entity." Tr. Jan. 19, 1996 at 15. The court followed up on that observation, inquiring "One of your arguments is that this instrumentality, this governmental instrumentality, through Ives, was trying to establish a religion?" *Id.* To which Venters' counsel answered, without equivocation, "Yes." *Id.* The defense made no contention at the hearing that this was a surprise, or that Venters had waived the claim. In this context, we believe it more than a bit disingenuous for the appellees to assert, as they do, that "Venters did not even raise the Establishment Clause in her oral argument to the District Court during the summary judgment hearing." Appellees' Br. at 39–40.

S.Ct. 1355, 1361–62, 79 L.Ed.2d 604 (1984); *Kerr v. Farrey*, 95 F.3d 472, 476 (7th Cir. 1996). The free exercise clause, by contrast, guards the individual's practice of her own religion against restraint or invasion by the government. *School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 222–23, 83 S.Ct. 1560, 1572, 10 L.Ed.2d 844 (1963). It is readily apparent from this rough sketch of the two clauses that coercing a person to conform her beliefs or her conduct to a particular set of religious tenets can run afoul of both the establishment as well as the free exercise clauses. *See id.* at 305, 83 S.Ct. at 1615 (Goldberg, J., concurring); *Engel v. Vitale*, 370 U.S. 421, 430–31, 82 S.Ct. 1261, 1266–67, 8 L.Ed.2d 601 (1962). But it is coercion that also distinguishes the two protections, for "a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." *Schempp*, 374 U.S. at 223, 83 S.Ct. at 1572; *Engel*, 370 U.S. at 430, 82 S.Ct. at 1266–67. Construed favorably to Venters, the record supports a claim for violation of her rights under either clause of the First Amendment.

Arguably, the facts that Venters has alleged fit most comfortably within the establishment clause framework. More than fifty years ago, the Supreme Court in articulating the meaning of that clause observed that:

> Neither [a state nor the federal government] can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.

*Everson*, 330 U.S. at 15–16, 67 S.Ct. at 511. By Venters' account, Ives virtually from his first day in office pressured her to bring her thinking and her conduct into conformity with the principles of his own religious beliefs, and admonished her in no uncertain terms that she was at risk of losing her job if she was unwilling to do so. Ultimately, of course, Venters did lose her job, and she ascribes the decision to fire her to Ives' perception that she did not measure up to his religious expectations. For the reasons we shall discuss below with respect to Venters'

Title VII claim, we believe that the evidence would permit a reasonable factfinder to conclude that religious considerations did play a role in Ives' decision to discharge Venters. If a jury ultimately were to conclude that Venters was fired because she did not live up to Ives' religious expectations, the discharge itself would of course amount to a violation of the establishment clause. *See id.* at 15–16, 67 S.Ct. at 511; *cf. Baz v. Walters*, 782 F.2d 701, 709 (7th Cir.1986); *Moore v. Gaston County Bd. of Educ.*, 357 F.Supp. 1037, 1043 (W.D.N.C.1973). But even if the jury were to conclude that Venters' termination was untainted by religious considerations, it might nonetheless find that Ives violated her rights under the establishment clause. Venters has alleged that she was repeatedly subjected to workplace lectures by Ives on his views of appropriate Christian behavior, to admonitions that she needed to be "saved" and faced damnation, and to rather intimate inquiries into her social and religious life. By Venters' account, this was all unsolicited and unwelcome, but she endured it for a period of time without objection in view of the fact that Ives was her supervisor and had threatened to fire those whom he viewed as immoral. When she ultimately did object, Ives continued nonetheless. A jury could find that by requiring Venters to submit to these religious dialogues by means of intimidation, Ives engaged in the kind of coercion proscribed by the establishment clause— even if he ultimately terminated her for lawful reasons.

The coercive nature of the conduct that Venters has described also renders it possible that Ives interfered with her right to the free exercise of religion. Public employment may not be conditioned on one's willingness to subscribe to particular religious principles or to any religious belief at all. *E.g., Torcaso v. Watkins*, 367 U.S. 488, 495–96, 81 S.Ct. 1680, 1683–84, 6 L.Ed.2d 982 (1961). When a public employee is discharged based on a religious assessment, her right to free exercise is violated just as surely as if she were refused a governmental job based on her refusal to declare a belief in the existence of a supreme being. *Id.* at 495–96, 81 S.Ct. at 1683–84. This is no less true when a public official, wielding the threat of

termination, pressures his subordinate to engage in a religious dialogue, to entertain his own religious beliefs, to worship at his church, and to comport herself in accord with the articles of his faith. These actions invade the realm that the First Amendment reserves to one's own conscience and interfere with the individual's ability to believe or not, to practice or not, as she wishes.

The district court was persuaded that the facts did not support any freedom of religion claim because:

Venters has not argued an injury cognizable as a constitutional claim. [S]he has not shown this court what constituted her protected conduct. The only possible conduct which might qualify is Venters' exercise of her own religious beliefs, and she has not shown any evidence of how she attempted to do so.

Mem. & Order at 9. This is a refrain that the defendants take up repeatedly on appeal. In order to state a claim for violation of her First Amendment freedoms, they reason, Venters must demonstrate that she held a religious belief that in some way conflicted with Ives' beliefs or the employment demands that he made of her, that she made the conflict known to him, and that he persisted nonetheless. Appellees' Br. at 26–27. That would be true if Venters were complaining that Ives failed to accommodate her religious beliefs, but that contention is not at the heart of the claims that Venters has asserted, nor must it be.[5] What Ives and the city have consistently overlooked is the coercive nature of the conduct that she has alleged. A request for an accommodation is hardly necessary to a claim under the establishment clause, nor is it a prerequisite to the type of free exercise claim that we understand Venters to be making. It is not as if Venters were complaining simply that she was uncomfortable with the religious views that Ives volunteered to her; what she alleges is that from the outset Ives required her to entertain those views and to submit to a religious inspection of her own life. We point out that

eventually, Venters did object to these dialogues and by her account to no avail. But if we accept that Ives did threaten to "trade" Venters if she did not prove herself a Christian worthy of employment in the "house of God," an objection is not a necessary component of her claim. Whether and to what extent Venters' religious beliefs (if any) may have conflicted with Ives' own is really immaterial. Even in the absence of a conflict, Venters had a right under the free exercise clause to work for the City of Delphi without being compelled to submit herself to the religious scrutiny of her superior.

The district court erred, therefore, in granting summary judgment in favor of Ives on the freedom of religion claims. The merits of these two claims turn largely on what the facts actually are, and as the district judge noted, there is "a whale of a big swearing contest going on here." Tr. Jan. 19, 1996 at 28. That is for the jury to resolve.

3. Title VII: Religiously Motivated Discharge and Workplace Harassment

Finally, Venters appeals the district court's grant of summary judgment in favor of her employer, the City of Delphi, on her Title VII claims.[6] By the district judge's reasoning, Venters cannot satisfy the elements of a prima facie case of religious discrimination under Title VII without informing her employer of her religious needs, and requesting that those needs be accommodated. Mem. & Order at 14. The City of Delphi asks us to endorse the district court's view, contending that Ives was entitled under the First Amendment "to talk [sic] and share religious beliefs with employees" unless and until those employees requested accommodation of their beliefs, and that Venters relinquished any right she may have had to be free of Ives' onslaughts by failing to make her own religious views known. (Appellees' Br. at 33–34.) Venters, however, argues that her discharge was motivated by the fact that she did not belong to Ives' church and did not

---

5. Venters does attempt at times to fit the facts of her case within the accommodation framework, but because we agree with her threshold contention that this is not, at bottom, an accommodation case, we do not consider the arguments she has made in this vein.

6. Venters does not challenge on appeal the district court's observation that Ives is not amenable to suit under Title VII. *See Williams v. Banning*, 72 F.3d 552 (7th Cir.1995).

subscribe to his particular view of Christianity. Under Title VII, Venters contends, membership in a particular church or adherence to a set of religious beliefs cannot be made a condition of retaining one's employment. Moreover, by drawing an analogy between her case and those involving sexual harassment, Venters also argues that Ives' treatment of her prior to her discharge created an intimidating and offensive environment which altered the conditions of her employment, and thus amounted to religious harassment under Title VII.

a.

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, provides that ["i]t shall be an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion...." 42 U.S.C. § 2000e–2(a)(1). The term "religion" is defined to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Thus, where an employee alleges religious discrimination on the ground that she was unable to fulfill a job requirement due to her religious beliefs or observances, we have held that a prima facie case requires the employee to demonstrate that the belief or observance was religious in nature, that she called it to the attention of her employer, and that the religious belief or observance was the basis of her discharge or other discriminatory treatment. *E.E.O.C. v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir.1997); *Beasley v. Health Care Serv. Corp.*, 940 F.2d 1085, 1088 (7th Cir.1991). Yet this paradigm only establishes the elements of a prima facie case of one particular type of religious discrimination that may arise in the workplace, and was never intended to apply to all possible claims of religious discrimination without regard to their underlying facts.

■ We agree with our colleagues in the Tenth Circuit that the accommodation framework on which the district court relied has no application when the employee alleges that he was fired because he did not share or follow his employer's religious beliefs. *Shapolia v. Los Alamos National Laboratory*, 992 F.2d 1033, 1037 (10th Cir.1993). Again, properly understood, Venters' claim is not that the city refused to accommodate her religious practices in some way, but that she was discharged because she did not measure up to Ives' religious expectations. What matters in this context is not so much what Venters' own religious beliefs were, but Ives' asserted perception that she did not share his own. *See id.* at 1037, 1038. She need not put a label on her own religious beliefs, therefore, or demonstrate that she communicated her religious status and needs as she would if she were complaining that the city had failed to accommodate a particular religious practice. Venters need only show that her perceived religious shortcomings (her unwillingness to strive for salvation as Ives understood it, for example) played a motivating role in her discharge. 42 U.S.C. § 2000e–2(m). In that sense, Venters' Title VII claim presents a very straightforward question no different in kind from that presented in the familiar cases of race, sex, and age discrimination. *Shapolia*, 992 F.2d at 1037. Simply put, "the question ... is whether the plaintiff has established a logical reason to believe that the decision [to terminate her] rests on a legally forbidden ground." *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158–59 (7th Cir.1996) (per curiam).

■ As in any other discriminatory discharge case, the plaintiff can establish that she was discharged on the basis of her religion through direct or indirect means. *E.g., Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1290 & nn. 6–7 (7th Cir.1997); *Helland v. South Bend Community School Corp.*, 93 F.3d 327, 329–30 (7th Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 769, 136 L.Ed.2d 715 (1997). Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination. The most obvious and compelling example would be a re-

mark to the effect that "I won't hire you because you're a woman," or "I'm firing you because you're not a Christian." *See Emmel v. Coca–Cola Bottling Co. of Chicago*, 95 F.3d 627, 629 (7th Cir.1996); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 893 (7th Cir.1996). But the evidence need not be this obvious to qualify as direct evidence. Evidence of discriminatory motives must, it is true, have some relationship with the employment decision in question; inappropriate but isolated comments that amount to no more than "stray remarks" in the workplace will not do. *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 569 (7th Cir.1989), citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Still, remarks and other evidence that reflect a propensity by the decisionmaker to evaluate employees based on illegal criteria will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality. *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir.1990); *Robinson v. PPG Indus., Inc.*, 23 F.3d 1159, 1164–65 & nn. 2–3 (7th Cir.1993). Proof of this nature supports the inference that a statutorily proscribed factor—race, sex, age, or in this case, religion—was at least a motivating factor in the adverse employment action at issue. *Terbovitz v. Fiscal Court of Adair County, Ky.*, 825 F.2d 111, 115 (6th Cir.1987); 42 U.S.C. § 2000e-2(m). This in turn activates a burden on the part of the employer to demonstrate that it would have taken the same action against the plaintiff even if the proscribed criterion had played no role in its decision. *Price Waterhouse v. Hopkins*, 490 U.S. at 258, 109 S.Ct. at 1795 (plurality); *id.* at 259–60, 109 S.Ct. at 1795 (White, J., concurring); *id.* at 261, 266–67, 109 S.Ct. at

1796, 1799 (O'Connor, J., concurring); *Veprinsky*, 87 F.3d at 893; *Randle*, 876 F.2d at 569. The persuasiveness of that showing will normally be for the finder of fact to assess, unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point. *See Veprinsky*, 87 F.3d at 893, quoting *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1519 (11th Cir.1990) (per curiam).[7]

Venters' case rests principally on direct, rather than indirect evidence of discrimination. Granted, at no time did Ives ever admit when he fired Venters he did so because she did not meet his religious expectations. But if we credit the evidence that Venters has presented, Ives promised to do just that on a number of occasions preceding her discharge. As Venters recounts events, Ives described the police station as "God's house"; and to work in that house, one had to be spiritually whole, and that required her to be "saved." If Venters proved herself unwilling to play by "God's rules," Ives warned her—if she did not choose "God's way" over "Satan's way"—she would lose her job. In a similar vein, after concluding that Venters was leading a life of sin, Ives proclaimed that he would not permit the "evil spirit that had taken [her] soul" to continue inhabiting the police department. One can readily infer from these remarks that Ives was not only willing (indeed, inclined) to evaluate employees in terms of his own religious beliefs and standards, but that in Venters' case, he actually did so. Nor is it by any means a strained inference that Venters did not measure up to the religious criteria Ives had articulated—consider, for example, his

7. We note that the Civil Rights Act of 1991 has supplanted the *Price Waterhouse* analysis in part. The employee can prevail under Title VII so long as an illicit criteria played a motivating role in her discharge, even if another, legitimate criteria also played a role. 42 U.S.C. § 2000e-2(m). *See Pilditch v. Board of Educ. of City of Chicago*, 3 F.3d 1113, 1118 n. 2 (7th Cir.1993), *cert. denied*, 510 U.S. 1116, 114 S.Ct. 1065, 127 L.Ed.2d 385 (1994). Moreover, even if the employer succeeds in proving that it still would have discharged the plaintiff even if the proscribed criterion had played no role in its decision, the plaintiff still may obtain declaratory and injunctive relief as well as attorney's fees, albeit not monetary relief

or reinstatement. 42 U.S.C. § 2000e-5(g)(2)(B). *See Tanca v. Nordberg*, 98 F.3d 680, 681–82 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1253, 137 L.Ed.2d 333 (1997). The upshot of these provisions is that once the plaintiff has presented evidence reasonably suggesting that her race, sex, religion, or national origin played a motivating role in her discharge, summary judgment will rarely (if ever) be appropriate; for even if the employer can eliminate all doubt at that point as to whether it would have taken the same action without considering the proscribed criterion, the plaintiff still might obtain limited relief.

observation that an "evil spirit" had taken her soul which he would not allow to inhabit the department. In view of his prior threats to fire her (which appear neither isolated nor remote in time from her actual discharge), the inference that Venters ultimately was fired on religious grounds does not require the kind of support that the *McDonnell Douglas–Burdine* framework derives from more circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54 & n. 6, 101 S.Ct. 1089, 1094 & n. 6, 67 L.Ed.2d 207 (1981). The inference flows instead directly from the remarks Ives allegedly made as to Venters' need to "save" herself if she wished to remain in the employ of the police department. *See Blalock v. Metals Trades, Inc.*, 775 F.2d 703, 708–09 (6th Cir.1985) (evidence that company owner was willing to give special consideration to those who shared his religious views, and withheld that consideration from those who did not, constitutes direct evidence that religion played a role in plaintiff's discharge), *cert. denied*, 490 U.S. 1064, 109 S.Ct. 2062, 104 L.Ed.2d 627 (1989).

Now it is true that the city has marshaled a considerable amount of proof that Venters' discharge was justified on grounds altogether unrelated to religion. Much of this evidence was gathered after Venters' discharge, and although relevant to the question of damages in the event she prevails, for example, it does not bear on the validity of her discharge because it was not evidence that Ives relied upon in making that decision. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 358–63, 115 S.Ct. 879, 885–87, 130 L.Ed.2d 852 (1995). Ives himself did articulate at the time of the discharge three facially non-discriminatory reasons for the decision that we have noted above. *See supra* at 964–65. The city argues that Venters has not presented evidence suggesting that these reasons were pretextual and thus cannot survive its motion for summary judgment. Venters has pointed to evidence in an effort to do just this, and this evidence too we have noted above (*supra* at 965) but we need not consider it. A showing of pretext is a part of the *McDonnell Douglas–Burdine* framework for cases relying on indirect proof

of discrimination, and that framework, as we have pointed out, is inapplicable here. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121–22, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Randle*, 876 F.2d at 568–69. In view of the direct evidence upon which Venters' case turns, the pertinent question is whether the city's evidence as to the legitimate reasons for terminating Venters eliminates any doubt as to whether religion played at least a motivating role in her discharge. *See* 42 U.S.C. § 2000e–5(g)(2)(B); *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Blalock*, 775 F.2d at 712–13. The answer is no. The conflict between the stories that the two sides have presented is clear: Venters describes a work environment dominated by a supervisor bent on reforming her religious life, who repeatedly threatened her with discharge if she did not play by "God's rules" and who ultimately did discharge her when she did not mend her sinful ways; the city describes an incompetent and surly employee who was patiently tolerated until the last straw had been broken. Crediting Venters' allegation that religious considerations were omnipresent during Ives' tenure as police chief, what role if any her religion (or Ives' perception of her religion) played in her discharge is a question that the jury must sort out. *See Shager v. Upjohn Co.*, *supra*, 913 F.2d at 402.

b.

Title VII, as we have noted, prohibits discrimination against an individual "with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e–2(a)(1). As we observed in *Sprogis v. United Air Lines, Inc.*, that phrase reflects an intent to "strike at the entire spectrum of disparate treatment...." 444 F.2d 1194, 1198 (7th Cir.), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971), quoted with approval in *Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 1375 n. 13, 55 L.Ed.2d 657 (1978); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986). Consequently, the reach of Title VII is not limited solely to discrimination that can be

described as "economic" or "tangible." *Meritor*, 477 U.S. at 64, 106 S.Ct. at 2404. It extends to workplace harassment that is attributable to the plaintiff's sex, as *Meritor* made clear, as well as to her religion. *Id.* at 66, 106 S.Ct. at 2405 (citing *Compston v. Borden, Inc.*, 424 F.Supp. 157 (S.D.Ohio 1976)); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993); *Iovin v. Northwestern Mem. Hosp.*, 916 F.Supp. 1395, 1409 (N.D.Ill.1996) (Castillo, J.); *Shapiro v. Holiday Inns, Inc.*, 1990 WL 44472, *9 (N.D.Ill. April 6, 1990) (Kocoras, J.); *see also, e.g., Ellis v. Wal–Mart Stores, Inc.*, 952 F.Supp. 1513, 1518 (M.D.Ala.1996); *Goldberg v. City of Philadelphia*, 65 Empl. Prac. Dec. para. 43,221, 1994 WL 313030, *10–11 (E.D.Pa. June 29, 1994); *Turic v. Holland Hospitality, Inc.*, 849 F.Supp. 544, 551 (W.D.Mich.1994), *aff'd. in part & rev'd in part on other grounds*, 85 F.3d 1211 (6th Cir.1996); *Turner v. Barr*, 811 F.Supp. 1, 2 (D.D.C.1993); *Weiss v. United States*, 595 F.Supp. 1050, 1056 (E.D.Va.1984). Sexual harassment can occur in either or both of two forms: *quid pro quo* harassment and hostile environment harassment. *Quid pro quo* harassment occurs when the availability to the plaintiff of tangible employment benefits is conditioned upon her compliance with a harasser's sexual demands. *E.g., Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir.1996), citing *Dockter v. Rudolf Wolff Futures, Inc.*, 913 F.2d 456, 461 (7th Cir.1990); *see also Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404–05. The second category of harassment, on the other hand, includes conduct that " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.' " *Meritor*, 477 U.S. at 65, 106 S.Ct. at 2404–05, quoting 29 C.F.R. § 1604.11(a)(3) (1985). Although these differing categories have been described in the context of sexual harassment, they serve to describe the differing manifestations of religious harassment as well. *Weiss*, 595 F.Supp. at 1056; *see also Turic*, 849 F.Supp. at 551. We take the opportunity to reiterate, however, that the distinction between the two kinds of harassment is analytical, not statutory. *Ellerth v. Burlington Indus., Inc.*, 102 F.3d 848, 855 (7th Cir. 1996), *vacated on grant of reh'g en banc* (Jan. 28, 1997). The varying permutations of harassment that people experience in the real world will not always fall neatly into one category or the other. As we explain below, the conduct that Venters has attributed to Ives and the city has elements of both kinds of harassment.

i.

The Supreme Court has recognized that a violation of Title VII occurs when discrimination based on race, gender, religion or national origin creates a hostile or abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. at 22, 114 S.Ct. at 371; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. at 66, 106 S.Ct. at 2405. *Harris* and *Meritor* were both cases of sexual harassment, which by now is a familiar kind of hostile environment claim. But as *Meritor* itself reveals, the federal courts have been applying hostile environment principles to harassment based on race, religion, and national origin as well as sex in the twenty-five years since the Fifth Circuit's ground breaking decision in *Rogers v. E.E.O.C*, 454 F.2d 234 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). *See* 477 U.S. at 65–66, 106 S.Ct. at 2405. Venters' claim that she was subjected to a hostile environment fits comfortably within this framework.

Whether or not the plaintiff's work environment may be considered "hostile" for purposes of Title VII is an assessment that depends on the totality of the circumstances. *Harris*, 510 U.S. at 23, 114 S.Ct. at 371; *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 534 (7th Cir.1993). Factors pertinent to this analysis include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. at 371; *Saxton*, 10 F.3d at 534. Whether, on balance, the harassment was "sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment" (*Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405 (internal quotation marks and citations omitted)) must be judged both from

an objective viewpoint (*i.e.*, that of the reasonable person) and from the subjective viewpoint of the plaintiff herself. *Harris*, 510 U.S. at 21–22, 114 S.Ct. at 370; *Saxton*, 10 F.3d at 534 (collecting cases).

■ From the evidence before us, a jury could reasonably characterize Venters' work environment at the Delphi police station as hostile and abusive. Without undertaking an exhaustive review of all of the evidence that might be pertinent to this assessment, we note that, by Venters' account, Ives repeatedly subjected her to lectures (at work, during working hours) about her prospects for salvation, made highly personal inquiries into her private life (whether there was truth to purported rumors that she entertained guests in her home with pornography, for example), and ultimately went so far as to tell her that she led a sinful life, that he was certain she had had sex with family members and possibly animals, that she had sacrificed animals in Satan's name, and that committing suicide would be preferable to the life he believed Venters was living. The defendants insist that Venters never informed Ives that she objected to these conversations; on the contrary, they point out that Venters on occasion joined the dialogue with Ives, asking him various questions about his religious views. In essence, defendants appear to suggest that if this was harassment, it was welcomed by Venters. But Venters represents that on February 14, 1994, when Ives allegedly announced his conclusions as to her life of "sin," she told Ives that he had "crossed the line" and would file suit if he did not keep maintain a professional relationship with her. Accepting that allegation as true, then whatever questions there might have been as to whether Venters welcomed these discussions were answered as of that date. Yet, Venters asserts that Ives did not refrain from proselytizing, and that the religious remarks continued unabated through the date of her discharge more than eight months later. She has not, it is true, given us examples of the kind of remarks that Ives made after she warned him to stop, but given the specificity with which she has described the discussions that predated that warning, we may assume that there was no significant change in Ives' purported behavior. *See Dey v. Colt Const. & Dev. Co.*, *supra*, 28 F.3d at 1456–57. Venters has made clear that she found Ives' words to her offensive; she has also made clear that in view of his threats to terminate her if she did not "save" herself, she found it difficult to tell Ives that she did not wish to engage in these discussions (although ultimately, she allegedly did so). Accepting Venters' recounting of the facts, we also think that a reasonable person in Venters' position could have found her work environment hostile. As Venters has described them, Ives' remarks were uninvited, were intrusive, touched upon the most private aspects of her life, were delivered in an intimidating manner, in some cases were on their face scandalous, and were unrelenting throughout the entire period post-dating his appointment as chief of police, continuing even after she had informed him that his comments to her were inappropriate. *Cf. Weiss v. United States*, 595 F.Supp. at 1056 ("Continuous abusive language, whether racist, sexist, or religious in form, can often pollute a healthy working environment by making an employee feel uncomfortable or unwanted in his surroundings."); *Compston v. Borden*, 424 F.Supp. at 160–61 ("When a person vested with managerial responsibilities embarks on a course of conduct calculated to demean an employee before his fellows because of the employee's professed religious views, such activity will necessarily have the effect of altering the conditions of his employment.").

ii.

■ Although *quid pro quo* harassment is most familiar to us in the form of supervisors soliciting sexual gratification from their subordinates, the facts as Venters has recounted them demonstrate that this type of harassment is not limited to gender discrimination. Our analysis in this respect can be brief. As we have emphasized already, Ives did not, by Venters' account, simply share his religious beliefs with her, but instead he made it clear to her that if she did conform to those views, she would be discharged. To recap: Ives told Venters that in order to be a good employee, one had to be spiritually whole, and to meet that criterion one had to be "saved"; he described the police station as "God's house," and

warned her that he would "trade" her if she did not play by "God's rules," if she did not embrace "God's way" over "Satan's"; Ives made repeated inquiries into her personal life, including whether she was attending religious services, suggesting that he was assessing her progress toward "salvation"; eventually, Ives concluded that an "evil spirit has taken [Venters'] soul," and he admonished her that he would not allow that "evil spirit" to reside in the police department. In addition, we note that when Venters eventually told Ives that he had "crossed the line," she warned him not only that she might sue if he did so again, but also that if he discharged her she would contest her dismissal in court. Ives' response allegedly was that no one's work was perfect, and that he would get the proof he needed to "put the handcuffs on her himself." From all of this, a jury could reasonably conclude that Ives made adherence to his set of religious values a requirement of continued employment in the police department. This fits neatly within the *quid pro quo* framework.

### 4. Ives' First Amendment Rights

We acknowledge, finally, that there may be some tension between the rights that Venters enjoys under the First Amendment and Title VII and Ives' own First Amendment rights. As the appellees' counsel noted at argument, Ives not only holds strong religious convictions, but he believes that "the Bible requires him to witness those [beliefs] to people who want to hear it." Yet, a key premise of Venters' case is that she had a right to be left alone to exercise her own thoughts on the subject of religion in private, free of interference from her governmental employer. The Eighth Circuit's divided decision in *Brown v. Polk County, Iowa*, 61 F.3d 650 (8th Cir.1995) (en banc), *cert. denied,* — U.S. —, 116 S.Ct. 1042, 134 L.Ed.2d 189 (1996), touches upon this tension. *Compare id.* at 658–59 (majority) with *id.* at 660 (dissent) and 37 F.3d 404, 409–10 (8th Cir.1994) (panel majority), *vacated on grant of reh'g en banc* (Nov. 25, 1994); *see also E.E.O.C. v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 619–22 (majority), 622–25 (dissent) (9th Cir. 1988), *cert. denied,* 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989). We are not called upon to draw lines at this juncture.

We merely take the opportunity to reiterate that Venters' case, as we understand it, does not rest on allegations of mere discomfort with religious views that we may assume Ives, even as a public official, was free to express, but upon allegations that Ives used his office to impose his religious views on Venters as his subordinate. Whatever the First Amendment may have entitled Ives to believe, to say, or to do, it did not permit him as a public official to require his subordinate to conform her conduct and her life to his notion of "God's rule book." *See Everson v. Board of Educ., supra*, 330 U.S. at 15–16, 67 S.Ct. at 511. It did not allow him to condition her continued employment on the state of her "salvation." *Ibid; Torcaso v. Watkins, supra*, 367 U.S. at 495–96, 81 S.Ct. at 1683–84. It did not grant him license to make highly personal remarks about the status of her soul when informed that these remarks were unwelcome. Whether he actually *did* any of this is, of course, for the jury to decide.

### III.

Although the evidence before us does not reveal a municipal policy or custom as Venters' constitutional claims against the City of Delphi require, it does lend sufficient support to her claims against Chief Ives individually under the speech, establishment, and free exercise clauses of the First Amendment. The evidence is also adequate to permit Venters' Title VII claims of discriminatory discharge and workplace harassment against the city to proceed to trial. We therefore AFFIRM the district court's grant of summary judgment in favor of the defendants in part and REVERSE it in part and REMAND for a trial on the surviving claims. Venters shall recover her costs of appeal.