SLOVITER, Circuit Judge,
dissenting.
I agree with the majority that, viewing the record in the light most favorable to plaintiff as we are required to for purposes of summary judgment, we must regard the statement allegedly made by Dr. Ross as direct evidence of discriminatory animus. I part from the majority, however, because I believe the majority has erred in disre *373 garding the significance of Hankins’ failure to meet one of the objective minimum qualifications for the job he sought.
The key to the District Court’s grant of summary judgment was its determination that Hankins had not produced evidence to show that he was qualified for the position of Director of the AIDS Activities Coordination Office (“AAOC”) (referred to by the District Court as “Program Director”). The majority holds that “there are substantial and material factual disputes concerning whether plaintiff had the necessary qualifications to become Program Director,” Maj. Op. at 367, a conclusion with which I disagree.
I would uphold the District Court’s conclusion that Hankins “plainly lacked the qualifications for the position,” Hankins v. City of Philadelphia, Civil Action No. 95-1449, slip op. at 28, 1998 WL 175600 (E.D.Pa.1998), because it was based on uncontroverted evidence in the record (1) that one of “the primary requirements] of both [the] Promotional Opportunity Announcements [was] that the applicant have permanent Civil Service status within thirty days of the closing date of the announcement,” id. at 24-25, and (2) that Hankins “did not and within thirty days could not have permanent Civil Service status,” id. at 28. The applicable Civil Service regulation, Regulation 9.026, made promotion open “to employees with permanent Civil Service status.” Hankins conceded that he lacked such status at the relevant time. For me, that is dispositive.
Undaunted by these plain facts, Hankins made several arguments why he should nevertheless have been appointed Program Director. First, Hankins argued that he could have taken the examination for Program Director while on probationary status and the City could have either temporarily appointed him or waited to appoint him until after he achieved permanent status. Second, Hankins argued that, as a reinstated employee, he should have been deemed eligible to take the examination for Program Director when the position was posted and then “certified” when he achieved permanent Civil Service status on September 1, 1993. Finally, Hankins argued that the City routinely manipulated the Civil Service regulations and should not be permitted to shield behind them.
The City was not required to excuse Hankins from the qualifications for Program Director unless it would ordinarily have excused other candidates from these qualifications under similar circumstances. As the District Court concluded, Hankins failed to present any competent evidence to suggest that the City would have excused other candidates from the permanent Civil Service status requirement. Hankins contends that the City frequently holds positions open or crafts temporary appointments to allow a candidate to achieve permanent Civil Service status, but he did not submit any evidence to support this contention.
Moreover, the Personnel Director of the City testified that it is consistent City policy and practice not to appoint persons if they do not have permanent Civil Service status and that individuals may not compete unless they meet the qualifications within 30 days of the closing date for applications, which Hankins was unable to do because the closing date for the position was June 30, 1993, and Hankins’ probationary period ended August 31, 1993. The District Court also found that Han-kins “presented] ... no competent evidence to substantiate his ... accusation that the City routinely manipulates Civil Service Regulations to achieve illicit goals.” Id. at 26. This is enough to support the District Court’s grant of summary judgment, without considering the City’s contention that Hankins also lacked the necessary experience.
The majority reasons that because the Civil Service specifications “were broadened in several respects to permit Richard Scott to qualify for the position,” a jury could infer that had the City wanted to select Hankins, it “would have amended *374 the civil service specifications in such a manner to allow Hankins, not Scott, to become eligible.” Maj. Op. at 367. The weak spot in the majority’s “amend at will” approach is the lack of any evidence in the record that the City had ever discarded the requirement that the applicant have permanent Civil Service status,[14] a requirement that Hankins did not satisfy at the time in question.
Hankins does not suggest that Scott lacked permanent Civil Service status, and the majority acknowledges that Scott had that status. Maj. Op. at 360. The changes in job qualifications that were made to enable Scott to qualify permitted a candidate to substitute a bachelor’s degree and three years of experience administering a “national HIV/AIDS program” for the requirement of a master’s degree and three years of second-level supervisory experience. The City’s willingness to permit candidates to substitute what appears to be an equivalent experience to meet this requirement does not support the majority’s conclusion that the City was flexible at will about the requirement of permanent Civil Service status.
Moreover, the changes in job description requirements were not made at the will of the personnel department. Instead the substitutions had to' be and were approved by the Civil Service Commission before they were made and before Scott resumed his employment with the City. Hankins offered no evidence to suggest that the Civil Service Commission would revise or delete the consistently applied prerequisite of permanent Civil Service status. In contrast, the City offered evidence that it had never done so. I would therefore uphold the District Court’s decision to grant summary judgment on the issue of Hankins’ qualifications.
One of the prerequisites of a plaintiffs Title VII case based on disparate treatment is a showing that plaintiff was qualified. for the position at issue, irrespective of which of the two different types of disparate treatment cases plaintiff falls within: the McDonnell Douglas-Burdine or pretext cases on the one hand or the Price Waterhouse or “mixed-motives” cases on the other. “[Wjhether a plaintiff has presented a pretext or a mixed-motives case depends on the quality of the evidence that the plaintiff adduces in support of the claim of illegal discrimination.” Walden v. Georgian-Pacific Corp., 126 F.3d 506, 513 (3d Cir.1997). For a case to be treated as a mixed-motives case, “the evidence must be such that it demonstrates that the ‘decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.’ ” Id.
Qualification for the position at issue is unquestionably one of the elements of a prima facie case for employment discrimination under the McDonnell Douglas-Burdine line of cases. See, e.g., Texas Dep’t of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). “The burden of establishing a prima facie case of disparate treatment is not onerous. The plaintiff must prove ... that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.” Id. at 253, 101 S.Ct. 1089 (emphasis added).
I believe that a plaintiff is required to show at least as much to shift the burden of proof to the defendant under the Price Waterhouse line of cases. We have described the showing that a Price Waterhouse plaintiff must make as “a high hurdle,” Walden, 126 F.3d at 513, and remarked that such a plaintiff “must *375 produce ... more direct evidence than is required for the McDonnell Douglas/Burdine prima facie case,” Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1096 n. 4 (3d Cir.1995). Although this language, reasonably construed, requires the plaintiff in a Price Waterhouse case to satisfy the additional requirement of submitting direct evidence of discriminatory animus, it does not mean that the plaintiff in such a case is excused from the McDonnell Douglas-Burdine requirement that she prove that she was a qualified candidate. As noted above, the Supreme Court has commented that this burden is “not onerous.”
I note that there is nothing in the 1991 amendments to Title VII, embodied in the Civil Rights Act of 1991, that suggests that a Price Waterhouse plaintiff need not be an objectively qualified candidate to survive summary judgment.
The 1991 Act arose from efforts to overturn the result of several Supreme Court decisions that members of Congress believed were inconsistent with Title VII’s goal of eradicating discrimination. One of the decisions explicitly targeted was Price Waterhouse.[15] In that case, a woman whose candidacy for partnership in an accounting firm had been placed on hold sued under Title VII and produced evidence showing that reviews from male partners containing sex stereotypical judgments had played a role in that decision; her employer produced evidence showing that she would have been denied that partnership even in the absence of discrimination.
The Supreme Court, in a plurality decision, held that “when a plaintiff ... proves that her gender played a motivating part in an employment decision, the defendant may avoid a finding of liability ... by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiffs gender into account.” 490 U.S. at 258, 109 S.Ct. 1775. The Supreme Court’s decision thus concerned the elements of a defendant’s affirmative defense of mixed motives rather than the elements that a plaintiff must prove as part of her initial showing before the burden is shifted to the defendant, the issue facing this court here. Its discussion assumed that the plaintiff had already both proven the equivalent of a prima facie case under McDonnell Douglas and Burdine, presumably including objective qualification, and submitted direct evidence of discrimination.
The House Report which constitutes the legislative history of the 1991 Act, H.R.Rep. No. 102-40(1) (1991), reprinted in 1991 U.S.C.C.A.N. 549, confirms that Congress, too, was concerned with the defendant’s affirmative defense, not the plaintiffs initial burden of proof. The Report opined that the inevitable result of the Price Waterhouse decision would be to permit employment discrimination prohibited under Title VII to escape sanction. Id. at 584. In response, Congress enacted the first of the 1991 amendments relevant here which added to the earlier statutory provision making it an unlawful employment practice to reach decisions based on race or one of the other prohibited considerations the language “even though other factors also motivated the practice.” 42 U.S.C. § 2000e-2(m).
The House Report also expressed disapproval of the lack of a remedy in a mixed motive case. It noted that, because of the Price Waterhouse decision, an employer whose employment decision was motivated in part but not exclusively by an illegitimate consideration could not even be enjoined from utilizing the same illegitimate *376 consideration in future decisions. See id. at 585 (citing as illustrative EEOC v. Alton Packaging Corp., 901 F.2d 920 (11th Cir.1990)). This led to the second amendment, which amended the remedy provision of the statute to provide that if an impermissible consideration was a motivating factor in the employment decision, the plaintiff could still be entitled to “declaratory relief, injunctive relief ... and attorney’s fees and costs demonstrated to be directly attributable ... only to the pursuit of a [Title VII] claim,” but not damages. 42 U.S.C. § 2000e-5(g).
In its discussion of the necessity of these amendments, the House Report assumes that plaintiff has already met her burden of proof, which I believe includes a showing that she possessed the objective minimum qualifications for employment in the position she sought. Nothing in the House Report suggests that the two amendments directed to the Price Waterhouse decision were meant to relieve plaintiff of the burden of showing that she possessed those objective qualifications, a burden established by the Supreme Court prior to Price Waterhouse. To the contrary, Congress defined its intent in adopting the 1991 legislation as “to restore Title VII’s comprehensive ban on all impermissible considerations of race, color, religion, sex or national origin in employment.” Id. at 585-86 (first emphasis added).
It follows that a plaintiff who patently failed to show that s/he has the minimum qualifications for the position could not proceed to trial on a Title VII claim either before or after the Civil Rights Act of 1991. My colleague Judge Cowen spins an unrealistic hypothetical web (i.e. a “minority job applicant who is told point blank at an interview that he is being denied the position because of his race”) in an attempt to show that an applicant who patently was lacking the essential objective qualifications needed for the position at issue can nonetheless proceed to trial because of that Act. I do not agree.
. The case Judge Cowen cites, Venters v. City of Delphi, 123 F.3d 956 (7th Cir.1997), makes no reference to the plaintiffs objective qualifications or lack thereof. Instead, in- Venters the defendant countered plaintiffs claim that she was terminated on account of her religion in violation of Title VII by attempting to show that it was plaintiffs performance, which the defendant claimed was deficient, that led to her termination. Id. at 964. Venters illustrates the paradigmatic mixed-motive case to which the amendments apply — where each party offers a subjective reason for the employment decision — one legitimate and one discriminatory. In such cases, the parties typically do not contest whether plaintiff meets the objective minimum requirements for employment in .the position.
The weakness of Judge .Cowen’s position is further illustrated by a not unrealistic hypothetical. Assume that applicable state law requires that all law enforcement officers be at least 21 years of age. May an 18-year old female applicant, whose application for employment with a township police department was denied, proceed to trial on the strength of evidence that the Township Police,Chief has openly expressed his view that women should not be hired as police officers because they do not have the strength necessary to do the work required by the police department? I would suggest that the only rational answer is no. The hypothetical situation is not dissimilar to that here — a remark has been made that can be deemed evidence of discriminatory motive and the plaintiff fails to satisfy an objective qualification for the position. I do not believe that Congress anticipated that a plaintiff who patently failed to show that s/he has the minimum qualifications for the position could proceed to trial because of the Civil Rights Act of 1991.
Because Hankins failed to satisfy an objective qualification for the Program Director position, I would affirm.

. There is no reason for the majority to be mystified by this assertion. Because of the pendency of this lawsuit, the City was understandably reluctant to find a permanent replacement. Jesse Milan was never employed by the City, having been on loan from Temple University. The other two individuals referred to by the majority, Patricia Bass and Joseph Cronauer, were hired on a contract basis. None of these individuals were hired at time Hankins had applied or Scott had been given the position.

. Another decision targeted, Wards Cove v. Atonio, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), was viewed as retreating from the disparate impact decision in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), by placing the burden on the plaintiff to demonstrate which criteria within a multi-factor employment practice have a disparate impact. Section 105 of the 1991 Act sought to restore the business necessity defense to its pre-Wards Cove status by amending 42 U.S.C. § 2000e-2.